**Michael DAVIS, by his next friend, Willie Mae Davis, Plaintiff,**

v.

**ANN ARBOR PUBLIC SCHOOLS, a public body corporate, et al., Defendants.**

Civ. A. No. 34620.

United States District Court, E. D. Michigan, S. D.

June 4, 1970.

George Stewart, David I. Goldstein, Washtenaw County Legal Aid, Ann Arbor, Mich., for plaintiff.

David T. Bell, Ann Arbor, Mich., amicus curiae.

Roscoe O. Bonisteel, Jr., Ann Arbor, Mich., for defendant.

## OPINION

TALBOT SMITH, District Judge.

The plaintiff before us is a junior high school student, 16 years of age. In view of the fact that he charges a lack of administrative due process we are required to set forth in some detail the procedures employed with respect to the offenses involved, though we make these incidents a matter of record with reluctance.'

Plaintiff transferred to the Ann Arbor Public Schools from California in September, 1969. From the very outset of his entry into the Ann Arbor school system, he presented serious problems to the school administration.

The initial difficulties of the plaintiff arose from his truancy. Shortly after school started in 1969, his mother was sent the following letter by Mr. Stipe, the Sophomore Class Principal:

Dear Mrs. Davis:

Mike is still having considerable difficulty getting to homeroom in the morning. We have given him a good deal of leeway until he became familiar with the school routines. I think that the time has definitely passed when we can overlook any further absences from this class. It is standard and accepted procedure that homeroom is a

regular part of the school day and must be observed as such. If Mike is unable to be in class by 8:00 A.M., the school is going to insist he not come at all. This would therefore become an unexcused absence upon each such occurrence.

This would be very unfortunate since there is really no reason why Mike cannot get here on time. Even Mike agrees this is so. Please encourage him to get started a few minutes earlier so there is plenty of time for him to visit with friends before the tardy bell rings.

Thank you very much for your cooperation in this matter.

Sincerely,

/s/ David W. Stipe

David W. Stipe

Sophomore Class Principal

One week later, on October 16th, he was suspended for one day for "Truancy" by Mr. Stipe, and copies of the suspension sent to the parent, the school principal (Mr. Rokicki), the social worker, and other officials.

A conference with Mrs. Davis and plaintiff was then held, the purpose of which was to reach some understanding with respect to re-admitting plaintiff to classes. Both Mrs. Davis and plaintiff assured the Class Principal that plaintiff would in fact attend classes regularly and upon this understanding and commitment plaintiff was re-admitted and sent to classes. Incidentally, and with reference to these parental conferences, we are satisfied from the testimony that they were frequent in number, either face to face or by telephone as plaintiff's conduct and attendance record worsened throughout the semester.

On December 2nd, the Class Principal again wrote to his mother, this time with reference to certain fires that had been started in the school. This letter, which follows in its entirety, is careful not to charge the plaintiff with setting a fire but speaks of the danger to the safety of many people through fires and contains a warning, obviously for parental discretion, that "if Mike is anywhere near another such incident, we will have little recourse than to implicate him."

Dear Mrs. Davis:

An incident has occurred at school Mrs. Davis, which makes it necessary for me to communicate with you concerning Mike. There have been several fires started in the past week in our boy's lavatories. On two of these occasions, Mike was in the bathroom when the fire was started. He even reported one of them to the office. Mike's presence could be a coincidence. However, there is just enough doubt that the school feels compelled to at least discuss the possibility with you. No thorough investigation is really possible or likely at this point because only the word of Mike and other students who admit to being present is available. No one wants to get anyone else into trouble. In the case of the fire during the lunch hour on December 1, three boys were seen by a custodian rapidly leaving the bathroom when he entered. Mike was one of these. By talking with three other witnesses, however, two of the boys were cleared of any implication. Mike was not. No one would say that he set the fire, but neither would they say that he did *not*.

Little damage occurred in either instance, but it is still arson. Arson in a public building is obviously an extremely dangerous situation. So dangerous, even if not harm is intended, that we must take every precaution to ensure it does not happen again. If Mike is anywhere near another such incident, we will have little recourse than to implicate him. It is highly unlikely a third "coincidence" would occur.

Please understand that I have not directly accused Mike of setting either fire. However, the school cannot be too cautious when it comes to the safety of 2,400 other people.

Sincerely,

David W. Stipe

Class Principal

The weeks that followed showed a persistence in the plaintiff in his failure to attend classes. The situation is described in the following letter to his mother, again from Mr. Stipe:

Dear Mrs. Davis:

This is to inform you that Michael's attendance habits have reached the point that drastic measures must be invoked. Mr. Roth informs me that you kept your son home from school on Monday and Tuesday, Nov. 24 and 25 because you wanted to insure us that Mike had agreed to attend classes and bring his materials. He returned to school on Wednesday, Nov. 26 and has supposedly been here this week.

The record shows that on Nov. 26 he was missing from his second and third hour classes. He did not work in the attendance office during the 4th hour. Mike did not go to his fifth hour Algebra class, and apparently left school rather than attend his study hall. All this the very day you had reached an agreement with him that he would attend classes.

On Monday, Dec. 1 he did not attend his math class nor study hall. On Tuesday he was absent from second, third, fifth and sixth hours. I spoke to him in the hall during fifth hour on two occasions. Mike was absent all day Wednesday, Dec. 3, except that he was in the Commons sixth hour. He was absent all day Thursday, Dec. 4. He did not attend homeroom today, picking up his attendance slips. He then left his slips in first hour. Mr. Sleeman, his second hour teacher, sent him back to gym to get his absence slips. Instead, Mike went into the Commons. Mr. Roth brought him to the office.

Mrs. Davis, this must come to a halt. Mike is not passing any course work, and is not likely to do so with this behavior and his attitude about school. I have told Mike that he may not miss *any classes* hereafter, or he will be asked to withdraw from school entirely.

Your cooperation in the past has been greatly appreciated. Thank you very much. I realize you have been very concerned about Michael and school. I sincerely hope this final action will not be necessary.

Respectfully,

/s/David W. Stipe

David W. Stipe

Class Principal

In the following week the situation with respect to absences did not better and plaintiff was suspended on December 12th for "Repeated Truancy". His mother was notified of this fact and also informed of the action by a letter which we quote:

Dear Mrs. Davis:

This is to inform you that Michael has not attended any classes today, December 12, 1969, nor has he attended most of his classes for the past week. Therefore, it has become necessary to suspend him from school. I will present this case to the Guidance Committee on Thursday, December 18, 1969 with the recommendation that Michael withdraw from school for the remainder of the semester.

This action is being taken in accordance with the stipulation set forth in a letter sent to you on December 5, 1969.

Please call me at 663–2431, ext. 63, if there are any questions about this action.

If Michael wishes to re-enroll for the second semester please make an appointment in January so that you and I can discuss the matter. We will evaluate the situation at that time.

Respectfully,

/s/ David W. Stipe

David W. Stipe

Sophomore Class Principal.

Another parental conference followed. It was a "carbon copy" of those preceding. The attendance situation was worse, as was plaintiff's attitude. It was the judgment of the class principal

that unless the plaintiff's pattern of conduct improved radically and immediately it would be his duty to ask the Guidance Committee to seek plaintiff's withdrawal or to suspend him for the remainder of the semester. (The purpose of "withdrawal" rather than suspension is to facilitate re-enrollment at a later time.) It was about this time, or shortly before, that Mrs. Davis insisted on plaintiff's being taught college preparation courses, which courses were then given him. Both Mrs. Davis and plaintiff again assured the school authorities of plaintiff's willingness to carry out his assigned courses. It was also about this time that the school authorities, feeling that defective vision might be at the root of plaintiff's problems, had his eyes examined and tested, presumably at the school's expense. In this, as in connection with other incidents, we are impressed by the care and attention given plaintiff's problems, and the efforts made to help him, all of which, unfortunately, proved unsuccessful.

Early in the new year, the current year, on January 5, 1970, his mother was advised of her son's poor performance in school and another parental conference was requested. This letter follows:

Dear Mrs. Davis:

Just prior to the winter vacation, the Pioneer High Guidance Committee met and discussed at some length the academic performance and behavioral pattern of your son. The result of their discussion was a recommendation encouraging your son to withdraw from school and "consider re-enrolling for the second semester." As you can well appreciate, Mrs. Davis, such a recommendation is indeed rare at our school where numerous efforts are made to help students adjust to a difficult situation. However, in the opinion of those who work most closely with Michael, our best efforts have been futile.

At the end of the nine week marking period, Michael had the following grades:

| | | | |
|---|---|---|---|
| Phys.Ed. | B– | English | Incomplete |
| Driver Ed. | U | Math 3 | E |
| Wld.Geog. | E | Foods | E |

Further checking with his teachers seems to indicate that Michael has little chance of passing those classes which he is presently failing. To further compound the problem, Mrs. Davis, our repeated efforts to gain information about his ninth grade record in California have been fruitless. So we are at a point where your son's official record indicates no credits in high school courses as yet.

All of this, I know, has been frustrating for you and Michael who seemed very interested in playing basketball for Pioneer High. There is absolutely no chance of this ever happening unless he is academically eligible and certainly he will never reach this status unless he makes up his mind to attend class and complete the work assigned. The total responsibility to see that this happens rests entirely with Michael.

Much of your son's future depends on his commitment to change. I suggest that you phone Mr. Stipe or me so we can arrange an appointment to discuss this serious situation. We all know that we cannot continue under the present circumstances. I hope we are able to do this in the next few days.

Sincerely,

/s/ Ted Rokicki

Ted Rokicki

Principal

The plaintiff's performance did not improve. On January 14th Mr. Rokicki, the Principal, again wrote Mrs. Davis in the following terms:

Dear Mrs. Davis:

I am very sorry to inform you that our agreement with Michael has not proved successful. There have been enough questionable incidents since Michael's return to force me to judge that he is not able to live up to all of

the conditions we agreed upon and were put in a letter to all of his teachers the day before his return. (See enclosed.) For example, on the day following his return, he arrived late to his English class and was sent to the locker room to get his books. He returned by a round about way and actually entered a girls' food class to talk to one of the students. When asked to leave, he did but not before the teacher stated she saw him with a cigarette in his hand. Mr. Stipe and I requested him to leave near two o'clock on that day and arrive the next with all of his school supplies at my office at 7:45 a. m. He arrived late but we did send him on to class. That very day, which was Friday, Michael was again late to his third hour class. He had returned to his second hour class to "find his books". I know because I was in the room visiting the class.

Finally, on January 12, Michael was in my office to see me at 10:30. After a brief conversation I sent him on to class. The teacher says he arrived with a corridor permit which read 11:15 which means it must have been altered.

Yesterday, after I had informed Michael that he had not lived up to his agreement, he was seen in the second floor corridor with a table leg in his hand near a group of students who seemd angry about an incident which had occurred earlier. Michael, of course, had no reason to be there nor had he any reason to have a table leg in his hand.

All of these incidents lead me to the conclusion, Mrs. Davis, that Michael should remain home during the remainder of this month and re-enroll for the second semester. If his records have not arrived from California by then, we will arrange for individual testing, as per our conversation, to help us in the proper placement of Michael in a helpful program of classes.

Sincerely,

Ted Rokicki

Principal

Various incidents which we deem it unnecessary to spell out in detail followed and on February 13th plaintiff was again suspended for "Nonconformance to Rules" the notice going on to state "until parental conference". Such conference was held with Mrs. Davis, the plaintiff, Mr. Edwards, the Human Relations Director, and the Class Principal, on February 15th or 16th, as a result of which plaintiff was re-admitted to school.

In view of the charges made to this Court that plaintiff has been unfairly treated from a procedural standpoint, we will interject here that the testimony is that up to this point there had been at least five person-to-person conferences with Mrs. Davis and "numerous" telephone calls.

On February 18th the plaintiff was found in the lavatory outside the cafeteria at a time when he should have been in his World Problems class, one of the classes to which he had been shifted at his own request. It was on this date Mrs. Davis was again informed by mail of the recurring problems with the plaintiff. This letter spoke as follows:

Dear Mrs. Davis:

It has become necessary to settle the issue of Mike's attendance and behavior in Pioneer High School. Even after you and I met with Mr. Edmonds and Mike, there is no real change in his behavior. He is still missing some classes entirely, still does not bring his gym clothes, is still in the bathrooms when he should be in class. In three days he has been found in three separate bathrooms, once in the presence of a fire being lighted by someone else, once with a boy who was shooting dice, and once with a group of several boys shooting dice. Mike spent most of his second hour today with our school social worker, then did not participate in

gym. His coach gave him a discipline report and sent him to his counselor. Mike tore up the report in front of another coach, and did not come to the office at all.

Mike is just not serious about going to school, Mrs. Davis. I know you are very concerned about this. However, we can no longer accept this behavior and attendance pattern in school. It would be better for all parties concerned, if you would officially withdraw Mike from school for this semester.

Mr. McEwen, Mr. Silverstone and I are pursuing some job opportunities for Mike. Mr. McEwen would be very willing to meet with you after school the first of next week to discuss these possibilities. However, Mike should be withdrawn as soon as possible.

I sincerely hope you will find this course acceptable. The school is prepared to follow through with a recommendation for Mike's removal to the Superintendent if we cannot work this out by mutual consent.

Please notify my office at 663–2431, ext. 63, or come in after 3:30 pm at your earliest convenience.

Respectfully,

/s/ David W. Stipe

David W. Stipe

Class Principal

This letter, it will be noted, is not a letter of suspension. It was phrased in the terms employed because it was the Class Principal's (Mr. Stipe's) understanding that Mrs. Davis would voluntarily withdraw the plaintiff if there were any more "incidents". The situation had reached the point by the 18th, according to Mr. Stipes, and the incidents were of such magnitude, that it was felt that plaintiff should not be continued in school under the circumstances. Consequently, Mrs. Davis was asked to come in with respect to the situation.

It was on this date, September 18th, that another incident relevant to the suspension decision occurred. The plaintiff was smoking in a school corridor, an act forbidden by school regulations. One of the teachers, Mr. Sleeman, passed him and salutations were exchanged, following which plaintiff "called after me (Sleeman) to be sure and tell Mr. Rokicki (the School Principal) that I had been smoking". Mr. Sleeman walked back and "as I was walking towards him he took the cigarette and placed it in his mouth and started smoking it". He informed Mr. Sleeman "that he did not care to go along with the rule" [against smoking] and told me that he wanted to make sure Mr. Rokicki knew it. As Mr. Sleeman left "I understood him to say that he wanted to bust Mr. Rokicki in the head and that he wanted to do this because he was white and because he hated all white men".

Mr. Sleeman (and Mr. Jackson, a custodian who had also witnessed the incident) reported the matter to Mr. Stipes who asked Mr. Sleeman to give him a written report. The next morning Mr. Stipes conferred with plaintiff concerning the matter. Plaintiff referred to all of the allegations as lies and "said that he would get Sleeman". He was then asked to leave the building and he replied that he would leave when he got ready. Plaintiff was thereafter, on September 19th, suspended for "Incorrigible Conduct". This suspension was not for a stated period but was designedly indefinite, to allow for a period for study and investigation. Mrs. Davis called promptly after the suspension and in the light of the ensuing conversation and the prior correspondence, Dr. Westerman, the School Superintendent for the Ann Arbor Public Schools was of the opinion that she was fully aware of both the reasons for the suspension and her right to take the next step on appeal, which she, indeed, invoked, namely, to go before the Board of Education. At no time did she specifically request additional information as to her son's conduct beyond that available from him and freely discussed by the school authorities.

The Board Meeting was held on March 4th, at a time of day adjusted to Mrs. Davis' convenience. Present at this time

were the plaintiff, his mother, and legal counsel. All were permitted to speak freely. The plaintiff sought to excuse his repeated truancies from classes which had been scheduled for him at his request on the ground that "they were not classes that he felt were worth attending". His counsel expressed disappointment that school personnel were not present, though no request was made that such personnel be produced for cross-examination (if, indeed, such is appropriate) or that formalized charges be brought. Counsel before us complains that "there was no sort of dialogue at all", apparently envisioning as an essential of due process that before the final step of suspension there be something like a trial. We shall comment in due course upon this view of the law applicable to this situation.

The Board met about a week later and considered the situation in detail. At that time it was furnished copies of the letters sent to Mrs. Davis concerning her son's conduct, Mr. Sleeman's report on the hallway incident, copies of plaintiff's deplorable California school record, which, according to Dr. Westerman, "unhappily confirmed our experience, but it came at a stage which enabled us to reflect on the fact that it had not caused us to pre-judge Mike's behavior," and Pioneer High School's record of plaintiff's behavior. The Board then approved a recommendation of suspension for the remainder of the semester. "It was the culmination", testified Dr. Westerman, "of a series of efforts to avoid that conclusion".

Shortly thereafter the plaintiff brought this action. He asserts that he was suspended without having been given an opportunity to be heard. In his Bill of Complaint he asserts he "was indefinitely suspended for smoking on school ground." And, in addition, he asserts that he was suspended "without any semblance of a fair hearing of the type required by due process of law, and that he has been deprived of his materials and property by the defendants without due process of law contrary to the 14th Amendment". An *ex parte* temporary restraining order countermanding his suspension was denied by the Court, and plaintiff now seeks a preliminary and permanent injunction enjoining the defendants from continuing to enforce the order suspending the plaintiff; from preventing the plaintiff in any way from attending his regular classes; from refusing to reinstate plaintiff as a high school student; from "maintaining on any school records or records in their control or possession, any writing or other indication that plaintiff was suspended, expelled or otherwise disciplined or (sic) a result of any of the activity set forth in this complaint"; from disciplining, penalizing, "or otherwise harassing plaintiff"; and, finally, that the defendants pay the plaintiff damages in the sum of $10,000.00 with costs and attorneys fees.

A full evidentiary hearing was had, the parties stipulating that it would serve for the purposes of decision on the permanent as well as the preliminary injunction. The plaintiff argues that he has not had due process. It should be noted at the outset of any due process ruling that the expression has no fixed, immutable meaning. The matter has been examined, and criteria articulated in two fairly recent cases. The first of these, Joint Anti-Facist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) holds that

> "Whether the *ex parte* procedure to which the petitioners were subjected duly observed 'the rudiments of fair play', * * * cannot * * * be tested by mere generalties or sentiments abstractedly appealing. The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, the balance of hurt complained of and good accomplished—these are some of the considerations that must enter into the judicial judgment."

The later Supreme Court opinion in Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) is equally in point:—

"consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." * * * "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. * * * ' "Due process" unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' It is 'compounded of history, reason, the past course of decisions * * * ' ".

■ What this means, less elaborately put, is simply that the standard for determining whether or not one has been afforded procedural due process is whether he has been treated with fundamental fairness in the light of the total circumstances. Buttny v. Smiley, 281 F. Supp. 280 (D.Colo.1968). In view, then, of the fact that the concept of due process has meaning only within the context of a particular fact situation, it would be well to advert at this point to certain basic principles, well established in the law, respecting schools and their regulation. Summarily stated, it is the mission of the public school system to impart to students committed to its educational care and supervision the learning necessary to enable them to lead useful and productive lives, to the end that the citizen will "be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens." Dixon v. Alabama State Board of Education, 294 F.2d 150 (C.A. 5, 1961) cert. den. 368 U.S. 940, 82 S.Ct. 368, 7 L.Ed.2d 193. Whether, in the language of lawyers, this is the young citizen's right or his privilege, or a benefit to him

is, on the facts of this case, an exercise in semantics. Whatever it may be called, he has it and it is not necessary for the purposes of this decision to draw the fine line, to explore the nuances. But the student, on his part, has some very definite obligations, duties, and burdens. In the first place he is only one of many, all of whom are his peers. He cannot arrogate to himself a course of conduct that will be detrimental to their equal opportunities to learn. Nor may he set himself up in defiance of the reasonable rules and regulations of the school, nor fail to accord his teachers the respect and deference due their position, their years, and their learning. The Supreme Court, in Sweezy v. State of New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 put well the foundation for these principles when it observed that "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth." Moreover, as the court in Burnside v. Byars, 363 F.2d 744 (C.A. 5 1966) held "Obedience to duly constituted authority is a valuable tool, and respect for those in authority must be instilled in our young people." In short, although it is of course true that a young citizen does not surrender his civil rights upon enrollment in a public school, McLaurin v. Oklahoma State Regents for Higher Ed., 339 U.S. 634, 70 S.Ct. 851, 94 L.Ed. 1149 (1950) it is equally indisputable that such enrollment does not clothe him with immunities not enjoyed by other citizens of the community. He has no special privilege not to conform to reasonable standards of speech and conduct, nor to enjoy any special considerations with respect thereto, and certainly his student status does not give him any right to violate or impair the rights of others, or engage in conduct that tends to deprive other students of an orderly atmosphere for study, and certainly not to insult, harass, or abuse the administrators of the school.

■ The school authorities, for their part, in order to carry out their important function, have both the inherent and

the statutory power to maintain order and discipline in the schools and to exclude from the student body those who are detrimental to such body and whose conduct is inimical to the exercise of the institution's scholastic function.

The statutory power here involved is phrased in the following terms in the school code of 1955:

§ 15.3613 [Suspension or expulsion of pupils; physical, mental handicaps.] The Board may authorize or order the suspension or expulsion from school of any pupil guilty of gross misdemeanor or persistent disobedience, or one having habits or bodily conditions detrimental to the school, whenever in its judgment the interests of the school may demand it: Provided, That except in a case in which the parents or legal guardian of a child refuses to have the child medically or clinically examined, no child may be expelled or suspended from school upon the basis of physical handicap unless the board has obtained a certified statement from a physician that the child is so physically handicapped that he should not attend school, or on the basis of mental handicap unless the board has obtained a statement from a psychiatrist or a child center or clinic or other appropriate agency approved by the superintendent of public instruction that the child is incapable of benefiting from public school attendance. (CL '48, § 340.613.)

§ 15.3614 [Rules and regulations.] Sec. 614. Every board shall have authority to make reasonable rules and regulations relative to anything whatever necessary for the proper establishment, maintenance, management and carrying on of the public schools of such district, including regulations relative to the conduct of pupils concerning their safety while in attendance at school or enroute to and from school. (CL '48, § 340.614.)

■■■■ The qualification imposed by law upon the above is that the authorities act neither arbitrarily nor capriciously. Buttny v. Smiley, *supra;* Goldberg v. Regents, 248 Cal.App.2d 867, 57 Cal.Rptr. 463, 473 (1st Dist. 1967). The schools deal with increasing numbers of students from all walks of life. The problems presented to the various schools differ widely. Consequently their powers in these areas are plenary, subject only to the qualifications we have noted. They must not only provide a suitable environment for study, and for relaxation, but must also uphold and protect the authority reposed in the teachers in the institution. Without these powers they have no power to guarantee the attainment of the education entrusted to them. Thus it is that the school authorities may and do formulate rules and regulations thought necessary or desirable for the maintenance of an orderly program of classroom learning and conduct. In so doing they have a wide latitude of discretion, subject only to the restriction of reasonableness. And so it is, also, that the courts do not rule upon the wisdom of the rules, or their expedience, but merely, as a substantive matter, when in issue, whether they are a reasonable use of authorities' power and discretion to maintain order and decorum by all appropriate means, including suspension and expulsion.

■■■■ The plaintiff's administrative due process attacks center largely upon two areas. He asserts, first, that he was not apprised of the reasons for his suspension, a contention belied by the record. It is clear to the Court upon the testimony taken that plaintiff had full knowledge of his various offenses against the school regulations and personnel, that he had had an informal hearing as to the incident on the evening of September 18th, and that he had thereafter been directed to leave the school. Plaintiff complains that there was no letter written to Mrs. Davis within the five day period set forth in the Pioneer High School Guide for notice of suspension, in fact that there was "no written notice of any kind that these were the incidents that in fact precipitated the suspension". The difficulty with this position was well

expressed by Doctor Westerman. He testified that there had been a "call from Mrs. Davis, which occurred so promptly after Mike's suspension on the 19th," that the school authorities were led to believe "that she understood then what the consequences were and wished to test them through consultation with the Board," and, also, that her step of appeal to the Board, "was based upon full knowledge of what would have been the content of such a letter if it had been necessary to send it." We cannot find these conclusions constitutionally defective. It is beyond question that the plaintiff had full knowledge of the manifold reasons for his suspension.

■ Plaintiff attacks, also, the proceedings before the Board of Education. He complains that there was no "dialogue", as he puts it, before the Board, with respect to a list of charges against him. What the plaintiff apparently envisions as required by administrative due process is something similar to an indictment, containing various counts, concerning which he will be tried by the Board of Education, with cross-examination of witnesses and the other attributes of a judicial proceeding.

The plaintiff misconceives the law. The opinion in the case of Dixon v. Alabama State Board of Education, *supra,* among others, takes care to point out the indisputable fact that "a full-dress judicial hearing, with the right to cross-examine witnesses" is not required for due process. Such a procedure, as well as the other panoply of judicial proceedings, such as discovery, challenges to the competence of the hearing officers, and the other requirements of either a civil or a criminal trial, would be totally at variance with the student-school relationship, would impose intolerable administrative burdens on the scholastic community, and would be disruptive of the very function the school is created to accomplish, namely, the impartation and ac-quisition of knowledge in a calm, orderly, and reflective atmosphere. Soon enough in these students' lives will come the adversary situations of mature life. The hearing procedure required, will vary depending upon the circumstances of the particular case. Dixon v. Alabama, *supra.* It may be more than an informal interview with a teacher or other official. It may require a committee, formal or informal, to weigh conflicting claims. But it is also clear (Dixon, *supra*) that it need follow no particular ritual and that the hearing procedure is one of a non-adversary nature. See, also Wasson v. Trowbridge, 382 F.2d 807 (C.A.2d 1967). To fasten upon school disciplinary hearings the rigid procedures of the adversary system of the criminal (or civil) courts would be totally disruptive of their proper function and detrimental to the interests of all students, the recalcitrant as well as the complaisant. The plaintiff's objections are not well taken. He has been fully informed as to the offenses charged, he has been heard with respect thereto, and he had due process in ample measure. The school authorities have shown great patience in dealing with this young student.

■ We do not here pass upon the reasonableness of the substantive regulations or their scope, nor the wisdom of the decisions of those entrusted with the duties of enforcement. These matters are the perogative of school administrators rather than the courts. The issue before us is, by stipulation of the parties, one of procedural due process. On this we find that the suspended student was fully informed of the charges against him and that he was afforded a hearing reasonable under all the circumstances. The school authorities acted properly within constitutional limitations. There was no lack of procedural due process. The motion for preliminary (and permanent) injunction and other relief is denied and the bill dismissed. A suitable order may be presented.