242 S.E.2d 907 (1978)
STATE of West Virginia ex rel. K. W. and C. W.
v.
Stewart WERNER, Commissioner of Corrections, etc., et al.
Nos. 14002, 14003, 14051 and 14052.
Supreme Court of Appeals of West Virginia.
January 31, 1978.
Concurring Opinion April 3, 1978.
*908 Charles R. Garten, Jr., Charleston, Kathleen Strasbaugh, Hamlin, for relators K. W. and C. W.
Richard E. Hardison, Deputy Atty. Gen., Pamela Dawn Tarr, Asst. Atty. Gen., Charleston, for respondents.
HARSHBARGER, Justice:
These petitions ask us to decide whether incarceration of male juvenile criminal offenders in the West Virginia Industrial School for Boys (known as "Pruntytown") violates their rights afforded by the federal constitution's Eighth and Fourteenth Amendments and by Article 3, Sections 5 and 10 of the West Virginia Constitution.[1] No issue is presented about adjudicatory processes by which petitioners were committed to the institution. The cases are here on petitions for habeas corpus and mandamus addressed to our original jurisdiction and the record consists of the pleadings, depositions and exhibits submitted by the parties.[2]
Thus we must examine the constitutional bounds within which government may act in dealing with juveniles convicted of delinquency for criminal activities. [We addressed treatment of those convicted of "status" offenses in our recent decision in State ex rel. Harris v. Calendine, W.Va., 233 S.E.2d 318 (1977).] We are asked to define according to the conditions of our society, the level of civility with which the state must deal with its youthful citizens, required by federal and state constitutional mandate.[3]
*909 It is well established in West Virginia that habeas corpus lies to test the constitutionality of the conditions of confinement. "Habeas corpus lies to secure relief from conditions of imprisonment which constitute cruel and unusual punishment in violation of the provisions of Article III, Section 5, of the Constitution of West Virginia and of the Eighth Amendment to the Constitution of the United States." Syllabus point 1, State ex rel. Pingley v. Coiner, 155 W.Va. 591, 186 S.E.2d 220 (1972).
K. W. is a fifteen-year-old young man from Lincoln County where he was adjudged delinquent for breaking and entering. C. W. is a fourteen-year-old boy from Logan County who was also found delinquent for breaking and entering.
In addition to testimony by petitioners and three other inmates, there were depositions by Edward Aman, Supervisor of Diagnostic Classification at the industrial school; Dr. Mary Bowman, educational evaluator; Dennis Bridgeman, Administrative Assistant to the Clinical Director of Weston State Hospital; Robert P. Hawkins, professor of psychology at West Virginia University; Samuel K. McDaniel, planner and former teacher and correctional officer at Pruntytown; Dr. Jerome G. Miller, Commissioner of Children and Youth for the Commonwealth of Pennsylvania; Richard Mohn, Deputy Director of Youth Services in the West Virginia Department of Corrections, and Chief Administrator of the industrial school; Francis W. Nestor, Director of Education at the school; Jean Berry Racine, consultant in early childhood education; Donald R. Swick, a practicing clinical psychologist; Joseph C. Taylor, a private practicing psychologist; and Stewart Werner, Commissioner of the Department of Corrections.
We gain these facts from the evidence, about the facility and treatment of inmates:
It is located about three miles from Grafton, in Taylor County. (It is within 35 miles of West Virginia University, Fairmont State College, Alderson-Broaddus College, Davis-Elkins College and West Virginia Wesleyan College.)
There are about 130 boys in the school, and some 100 staff members (both full and part-time). The inmates are housed in four "cottages" and a reception center. Their sleeping quarters are open dormitories in which each inmate has a cot, wall locker and drawer-like locker that is under his cot. The average duration of incarceration is nine months.
At the time the petitions were filed, certain inmate disciplinary practices were routinely employed at the institution:
1) Inmates thought guilty of serious disciplinary offenses, such as escape, were punished by confinement in small, windowless steel-walled cells (there are three cells) furnished with a combination toilet, wash basin and drinking fountain, a steel cot with flame-proof mattress, and a light. There is an aperture in the door about eight by eight inches through which food and *910 other articles can be passed. The cells are about four feet wide, eight feet long and eight feet high. Youths placed in them were allowed to wear only their undershorts.
2) "Floor time" was a punishment whereby the inmate apparently was required to stand stiffly in one position for several hours each day without talking.
3) "Bench time" was a punishment that required the inmate to sit in a specified location with arms crossed for several hours each day and for several days without talking or moving.
4) Mace, a chemical irritant, was freely used by staff upon inmates whose behavior did not suit staff requirements.
It is uncontroverted that both petitioners have been confined in a security cell and both have had "bench time". K. W. has had "floor time" and has been physically assaulted by a staff member and threatened with Mace attack in a security cell. C. W. was "maced" in a security cell and was required to scrub floors with a toothbrush for many hours.
However, respondent Commissioner of Corrections Werner testified that use of security cells has been stopped except as a temporary restraining place for children who are out of control; that Mace is to be used only to quell riot-type disturbances; that "floor time" and "bench time" have been abolished, although there is "quiet time" during which an inmate must remain at one location and speak to no one, but is free to read or write and to change his body position. respondent testified that physical assaults by staff or inmates are now strictly forbidden.

I.
Even though the physical brutalities practiced at the institution have been halted, we comment upon them, in case the government should be inclined sometime in the future to embrace them as attractive disciplinary devices.
We must test the acts according to present day concepts of morality and decency that mark the progress of a maturing society. Weems v. United States, 217 U.S. 349, 378, 30 S.Ct. 544, 553, 54 L.Ed. 783 (1910); Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). State ex rel. Pingley v. Coiner, 155 W.Va. 591, 186 S.E.2d 220 (1972). Let us suppose they were methods of discipline imposed upon a child by its father: would not this court sustain removal of the child from such a brutal environment, even if the parent should protest (as does the state) that he were merely attempting to maintain order in the home so he could educate the errant child, provide enlightenment, cultivation and culture?
Is the cruelty any less when its excuse is its supposed necessity to gain the child's undivided attention? Certainly not. And we cannot tolerate inhuman treatment by the state that we would not tolerate if practiced upon its victim by his or her own family.[4]
Morales v. Turman, 383 F.Supp. 53 (E.D. Tex.1974), rev'd on other grounds, 535 F.2d 864 (5th Cir. 1976), rev'd per curiam, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977), presents an exhaustive examination of the Texas postadjudicatory treatment of juvenile offenders and Judge Justice dealt with these very same acts:
"Practices found by this court to violate the Eighth Amendment were: the widespread practice of beating, slapping, kicking, and otherwise physically abusing juveniles in the absence of any exigent circumstances, see Ingraham v. Wright, 498 F.2d 248 (5th Cir. July 29, 1974); the use of tear gas and other chemical crowd-control devices in situations not posing an imminent *911 threat to human life or an imminent and substantial threat to property; the placing of juveniles in solitary confinement or other secured facilities, in the absence of any legislative or administrative limitation on the duration and intensity of the confinement and subject only to the unfettered discretion of correctional officers; the requirement that inmates maintain silence during periods of the day merely for the purpose of punishment; and, the performance of repetitive, nonfunctional, degrading and unnecessary tasks...."
Therefore, we hold that the enumerated practices, and any similar behavior by officers of the government is cruel and unusual punishment, forbidden, and every person subjected to any of them (except where riotous conditions endangering other persons may require measures to subdue those who may reasonably be expected to hurt themselves or others) shall be entitled to redress. See, Inmates of Boys' Training School v. Affleck, 346 F.Supp. 1354 (D.R.I. 1972), and Morales v. Turman, supra.
We find these further observations in Morales: `Confinement under circumstances giving rise to a high probability of physical injury to inmates, whether because of insufficient custodial staff or otherwise, may constitute cruel and unusual punishment. E. g., New York State Association for Retarded Children v. Rockefeller, 357 F.Supp. 752 (E.D.N.Y.1973). Two practices fall in this category of eighth amendment violations. The first is the practice of housing up to forty boys in an open dormitory, with the only correctional officer on duty locked in a `cage' and prevented from assisting boys in an emergency. This `cageman' is confined to a small area, elevated above the dormitory and separated from the two areas of the dormitory by wire mesh. He must call by telephone to other correctional officers outside the dormitory for assistance in time of stress.
"The second such practice is the failure to administer proper psychological testing or other screening procedures to eliminate potential staff members unqualified to treat juvenile offenders."
The first of these practices does not exist at Pruntytown. The night dormitory staff activity was described by Richard Mohr, Chief Administrator:
"Q What does the staff do at night then for example? Do they just sit at the desk located in the dormitory?
A They are located in a dormitory yes, at a desk. Of course they are required to make a head count on the hour, maintain security of the premises.
We also have a shift supervisor that rotates between the cottages to make sure that the staff are awake and on the job. The shift officer or the cottage officer also calls into the switchboard on the hour.
Q This headcount that is done on the hour, is it possible for a boy to get up in that dormitory area and leave the room without being seen by a staff person?
A I wouldn't think so.
Q In fact aren't there glass, oblique (sic) glass panes even between the bathroom area and the dormitory area?
A Yeah.
Q So a staff person could even see a boy who needed to go in and use the lavatory?
A Right, sir."
.....
We find that the personal staff supervision of nighttime dormitory life calculated to prevent inmate abuse of other inmates, distinguishes Pruntytown from the open dormitory situation condemned in Morales wherein the staff was physically isolated, "caged" from the population and thereby incapable of quick action to prevent injury of one inmate by another.
The second practice condemned in Morales as fostering high probability of physical injuries to staff inmates concerns the psychological fitness of institutional staff members. We have no evidence before us about psychological testing of staff members at Pruntytown to detect guards who may predictably injure inmates. West Virginia Civil Service regulations prescribing *912 qualifications of correctional officers in all grades have a physical examination requirement. None mention any psychological or psychiatric standards of testing. There is evidence of past staff brutality which, according to Commissioner Werner, justified immediate dismissal of offending staff members and will be cause for firing in the future.
We find that after-the-fact dismissal of psychologically unsuited staff persons who brutalize inmates is an inadequate way to cull unfit staff members. Reliance upon this method guarantees that a youngster will be harmed. The result is that the children are guinea pigs that test for brutal or sadistic staff members whose penchants surface when they hurt someone. We recommend pre-hiring and periodic psychological testing or other screening techniques of the keepers to identify those who may be unable to restrain violent impulses.

II.
Another, more difficult, problem is whether any institutionalization of juveniles is constitutionally permissible and hence, imprisonment at Pruntytown constitutionally prohibited.
Dr. Jerome Miller testified that institutionalization of youths is not the best way to treat any except those that require secure detention to protect themselves or the public from physical harm. He stated that, "It would be very unusual and perhaps almost a matter for a suit or for prosecution were a family to deal with their own juveniles the way institutions almost routinely deals (sic) with juveniles. You would not think, for instance, in a family if a youngster were to run away, of taking him home, taking all his clothes off and locking him in a closet for two weeks. It would be odd behavior, but that would be considered reasonable in an institution because if you don't, everyone else will run and it relates to the institutional needs. It has nothing to do with therapy or really even effective control."
"So that in all institutions there is an ultimate hammer somewhere that is used by staff to control. It is a balanced sort of thing whereby if you take away for instance, if you take away the dungeon [security cell], you will have to anticipate other things, staff doing other things to control the youngsters over a period of time or making other threats about worse things, because those are almost necessary to the institutional needs of control." (Our emphasis.)
Quere, do institutional controls require unconstitutional brutalities, and therefore must institutionalization of youths be abolished? Dr. Miller was a witness in Morales. Found by Judge Justice to be "of unquestionable expertise" (383 F.Supp. p. 122), he testified that staff improvement at one of the facilities that was ordered by the court to be closed "could not overcome the hostility to humane treatment that is a part of the institution's tradition."
He and other knowledgeable persons testifying in Morales, opined that institutionalization is useless, even harmful, for the great majority of juveniles because the measures needed to maintain control simply defeat treatment and rehabilitation.[5]
*913 Dr. Robert P. Hawkins, a West Virginia University professor of psychology, also testified to the counter-treatment effect produced by the disciplinary measures required by this institutional need to keep order:
It seems just a natural the way it is run it seems like a natural outgrowth of the whole institution model. Once they collect that many human beings together who have not been historically extremely responsible, you inevitably get some cases of homosexual behavior, physical violence, and such. So the next step to the institution person's point of view is logically to reduce their privacy by making it possible to watch them all the time.
Q Would you say that privacy is important for any of the goals that you suggested are important; for example, developing social skills, responsibility, less disruptive behavior and that sort of thing?
.....
A Yes, because I think that one of the first things that you have to do in conducting any kind of treatment is remember that whatever you do serves as a model in the youngster.
If you show little respect for his dignity, for his value as a human being, as a person, for his integrity, then that is what you are teaching him to show other people whether you intend to or not.
It seems to demonstrate the impersonal way the boys are dealt with there seems to demonstrate that they are not highly valued, that they certainly are not trusted, and I'm afraid that the effect of that on their future behavior and on their willingness to trust you in any way is pretty negative.
Juveniles are constitutionally entitled to the least restrictive alternative treatment that is consistent with the purpose of their custody. See, Nelson v. Heyne, 491 F.2d 352 (7th Cir. 1974); Morgan v. Sproat, 432 F.Supp. 1130 (S.D.Miss. 1977); Pena v. New York State Division For Youth, 419 F.Supp. 203 (S.D.N.Y.1976); Lavette v. Corporation Counsel, 35 N.Y.2d 136, 316 N.E.2d 314 (1974); State v. Frazier, 254 N.C. 226, 118 S.E.2d 556 (1961). Our statutory law has long expressed this state's policy requiring alternative methods of treatment of juvenile offenders. See, W.Va.Code, 49-5-11 [1975], 49-5-13 [1977].
We could say, following the precedent of Harris, supra, that certain types of juvenile offenders shall not be committed to state institutions but shall be treated by one or more of the alternatives statutorily authorized. But it seems to us to be oversimplification to mandate, for example, that no juveniles convicted of delinquency because of crimes against property shall be institutionalized, although clearly both the classification recognized by separate categorization in our criminal code and philosophy about crimes against property recommend that treatment of their perpetrators be less strident than treatment of people who personally assault other people.
But we hesitate to impose our judgment about proper correctional practices upon the legislative or executive branches of government when there is not a clear showing that the treatment to which the child is subjected is cruel and unusual or violates his rights to equal protection of the law.
The Morales court did not find institutionalization of juveniles unconstitutional *914 per se. It simply held "that the institutions of the Texas Youth Council with their special qualities and attributes, were on the whole incapable of fulfilling the constitutional requirement that each institutionalized juvenile receive rehabilitative treatment." (383 F.Supp. p. 124.)
The court cited the geographic locations of Texas facilities that made 1) family involvement in the juvenile's life impossible for most inmates, 2) locally recruited staff necessarily provincial with no understanding of urban youth problems, 3) recruitment of highly skilled professional staff difficult, 4) use of community resources "such as universities, clinics, and specialized medical services" impossible, 5) furloughing and other transitional measures nearly impossible, and 6) vocational education programs, where there are few employers in the area to cooperate, ineffective.
The West Virginia Industrial School for Boys suffers from only two of the deficiencies listed by Judge Justice: 1) it is located in the northern segment of the state, making family visitation to children from southern West Virginia difficult and 2) also because of its geographic location furloughs might be impractical.
The other objections to the Texas physical facilities that prompted their closure do not apply to Pruntytown. In fact there are some very positive aspects to consider about the Pruntytown program, as now operated. We even note that the formal education program at Pruntytown received relatively good marks from all the petitioners' witnesses who testified about it. Dr. Miller said:
I saw the learning lab. I think they are making a very good, honest attempt to provide some educational services for the kids. I think some very well motivated teachers were clearly there, were very involved, and I wouldn't want to denigrate or put down those kinds of efforts. I think they are very good. It has just been my experience that over the long haul it is hard to keep them at a level of competence, that people become jaded in the institution setting. Despite all those efforts, that over the long haul it is somewhat in vain, and I think that is an informed opinion based on the history of these places. It is very difficult to sustain good programs.
Dr. Miller's one qualification to the compliment to the education program was his observation about the difficulty in keeping staff interested and fresh.
Dr. Mary Bowman, an education evaluator, testified:
A ... They have a basic education program for all boys which includes math, science, language arts, spelling, reading, social studies, choir, and the phys. ed., I believe that is it, then plus a special educational remedial classes.
Q Were you able to reach an opinion as to the attitude of the residents toward the educational program?
A Yes, I was.
Q What was that opinion?
A The entire two days that I was there, anytime I had a chance to ask any of the boys what they liked about the place, Pruntytown in general, invariably they said the school. They liked the school. They felt that consistently the boys said that they liked the teachers, that they liked school better here than they had on the outside.
They felt that they got more individualized attention, that the work was manageable. I took that to mean that it was suitable to their needs or their abilities. There was never a critical word from the boys about the school.
Q Did the program itself seem to deal individually with each resident rather than just lumping them all into one group and trying to teach?
A Very much so, very much so. The class that I observed, the two classes I observed every student appeared to be working on a different level or on a different activity, and the teacher would be talking with them at her desk or at his place of work, discussing an assignment, often it was a little package, something that she had *915 xeroxed, planning notebooks were full of little individualized plans, and the kids would come in and check and see what they were supposed to be doing and then she would kind of float around to see that they were doing what they were supposed to, very individualized.
The boys were getting a tremendous amount of personal attention.
Q Did you see the library?
A I saw the library.
Q Did it seem to be adequate?
A Adequate. Probably more books there than any kid is ever going to use, and more books are on their way, working with the Library Commission here in Charleston, apparently there is an abundance of funds, and the librarian is building a professional library at this time, which is to augment the reading and training of staff.
We hold that there is not sufficient evidence of lack of rehabilitative programs at the industrial school or of institutional brutality to require us to find its use to be unconstitutional. But we recommend that incarceration of young people in the school should be limited to those who will clearly benefit from institutionalization or to those who are dangerous to themselves or others.[6]
*916 The expert testimony presented by petitioners in this case seems aimed at deinstitutionalization of all juveniles. We are not opposed to the concept, but believe the implementation must come from the legislature or the executive, but not from us. The real and meaningful prohibitions imposed upon us by the separation of powers doctrine makes us reluctant to prescribe, because we are not properly in the business of prison supervision or standards-making.
The lack of staff competency or vigor seems to be the main base for criticism of institutions that treat delinquent youth. We cannot refrain from suggesting that Pruntytown staff competency and vigor could very easily be maintained and refreshed by extensive use of carefully supervised college students in the education, psychological, psychiatric, medical and legal services provided to inmates. And with the largest state university and four other colleges nestling in the hills within thirty-five miles of Pruntytown, there would seem to be a readily usable pool of talent from which to choose. One might even suggest college programs offering credit in psychology, psychiatry, law, sociology and medicine, for work at Pruntytown.
We abhor the use of such practices as "benching" and "floor time" described above and declare them to be cruel and unusual punishment. Solitary confinement is not to be used as a routine disciplinary procedure, but only in instances when physical restraint and isolation of a juvenile are absolutely necessary to enable him to gain personal control of himself. Mace may be used only to quell riots.
We urge the Department of Corrections to continue evident improvements in treatment of juvenile offenders, and to keep ever in mind that this state through its officers and employees owes to every struggling child the very same high level of behavior, that it expects of him or her.[7]
Writ denied.
MILLER, Justice, concurring:
While I concur in the judgment of the Court, I have some different views that are not contained in the opinion. My concurring opinion covers three principal points. First, I believe that procedurally this Court is not equipped to handle this type of case in an original habeas corpus proceeding. My second point covers the constitutional guidelines for juvenile detention facilities. Finally, I address the question of why immediate release of the relators is not required.

I
This case has undergone a rather substantial metamorphosis. Initially, the thrust of the petitions of both K. W. and C. W. was a claim that they were subjected to cruel and unusual treatment at Pruntytown, primarily because of the practices surrounding solitary confinement in the "hole."[1]
Upon the filing of the petitions, this Court acted promptly by issuing a preliminary order that relator K. W. be released from solitary confinement pending final resolution of the case.[2] A return day for *917 the writs was scheduled for October 11, 1977. Both parties sought and obtained continuances in order to take evidentiary depositions, and the case was scheduled for oral argument on November 22, 1977.
When the case was argued there was a decided shift in the position advanced by relators. From the initial claim of cruel and unusual punishment arising out of the solitary confinement policy, we were urged to consider the question of closing Pruntytown on the ground that it was anti-rehabilitative, and we were asked to apply law that has developed in a number of federal district court cases where judicially fashioned guidelines were imposed on state juvenile detention facilities. Morgan v. Sproat, 432 F.Supp. 1130 (S.D.Miss.1977); Harris v. Bell, 402 F.Supp. 469 (W.D.Mo. 1975); Morales v. Turman, 383 F.Supp. 53 (E.D.Tex.1974), rev'd on other grounds, 535 F.2d 864 (5th Cir. 1976), rev'd per curiam, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 372 (1977); Martarella v. Kelley, 359 F.Supp. 478 (S.D.N.Y.1973); Inmates of the Boys' Training School v. Affleck, 346 F.Supp. 1354 (D.R.I.1972).
There are, however, marked differences between these cases and the record which we have before us. In the first place, the federal cases demonstrate the courts did not set guidelines until they had before them an extensive initial record which demonstrated in detail the abuses and inadequacies that existed.
Moreover, those courts had the benefit of testimony of a number of specialists, including the testimony of psychiatrists, physicians, educators, penologists and sociologists, who uniformly testified that conditions were far below acceptable standards. These experts furnished the courts with specific recommendations and standards which could be applied to begin corrective action.
Morales is perhaps the leading case in the field. The court's holding in that case embraced the entire Texas juvenile detention system. But the district court, before making its final decision, had the case under consideration for more than three years. Expert "monitors" were appointed at the initial stage of the case to examine the facilities and to provide the court with some independent basis on which to weigh the testimony of the parties.
As an appellate court we are not equipped to engage in direct fact-finding or to take live testimony. Where facts must be developed, normally depositions are taken outside the Court. As a consequence, we do not have the benefit of observing the witness or making inquiry into relevant areas, all of which are available to the trial judge. Moreover, a single trial judge who hears the testimony is in a much better position to make factual findings than five appellate judges who are reviewing a "cold" record. There can be little doubt that we are not able procedurally to handle adequately a Morales-type case on an original application in habeas corpus.[3]
Because of the limited record before us, in my judgment it is not possible to make any comprehensive evaluation of the conditions at Pruntytown. None of the experts either for the petitioners or for the State were able to provide a detailed analysis of the system in operation at Pruntytown, or to determine which practices were below commonly acceptable standards in the juvenile detention field.[4]
The record discloses that Pruntytown has a psychological, scholastic and general aptitude testing program and that each youth is *918 tested upon his arrival at the school. This appears to form a basis for attempting some individualized treatment.
The institution has a behavioral modification program called the Peer Group Pressure Program where, under the leadership of a counselor, the youths are encouraged to discuss frankly their behavioral attitudes with the other members of the group. The program is apparently a recognized method of encouraging rehabilitative efforts through group therapy.
As the majority opinion points out (ante, at 914), all experts who testified approved of the existing educational program. In addition to its scholastic program, the school offers a regular vocational program and a formal sports-recreational program, including a limited competitive sports program with area schools. These programs certainly cannot be characterized as anti-rehabilitative.
Based on the record in this case, there is not sufficient evidence to warrant a discussion of whether the institutionalization of criminal juveniles is per se unconstitutional. I recognize that Dr. Miller, one of relators' experts, is of the view that in the majority of cases institutionalization may not help a juvenile, and indeed may harm him if there are no rehabilitative programs available. However, no court has adopted this view.
Moreover, the record does not demonstrate sufficient facts to warrant the conclusion that Pruntytown's system is anti-rehabilitative. In certain extraordinary circumstances a court can, under the cruel and unusual treatment prohibition of the State and Federal Constitutions, intervene to force modification of conditions in detention facilities. Nelson v. Heyne, 491 F.2d 352 (7th Cir. 1974); Morgan v. Sproat, supra; Morales v. Turman, supra. We in effect have done this by holding that confinement in the "hole", "bench time", "floor time", and general "macing" as practiced at Pruntytown are constitutionally impermissible.

II
My divergence with the majority is that we have failed to enunciate specific constitutional guidelines to govern juvenile detention facilities, since relators have raised a number of these constitutional issues in their petitions and briefs. The thrust of relators' argument is that the statutory standards imposed by W.Va.Code, 49-5-16, for confinement of juveniles, are already constitutionally mandated.
The majority states in note 3 that these standards are "consistent with our conceptions of constitutionally mandated care." Taking the statutory standards as a whole, I believe they represent, in the main, what courts have already mandated under various constitutional guarantees, although I do not believe the failure to observe each individual standard would give rise to a constitutional violation.
As specific illustrations, W.Va.Code, 49-5-16(b)(1), prohibits the use of physical force or solitary confinement to punish juveniles. The use of physical force on juveniles presents a difficult and delicate problem. In an adult context, the whipping of a prisoner with a strap has been condemned as cruel and unusual punishment. Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968).
In Nelson v. Heyne, supra, the court found that beating juveniles on the buttocks with wooden paddles was cruel and unusual punishment. The beatings were used to discipline juveniles who had escaped from confinement or who had been accused of assaulting other students or staff members. They were administered after a decision by two staff members, and staff personnel were also required to serve as witnesses.
Nelson recognized that in proper instances the administration of corporal punishment by school personnel would be appropriate, thus anticipating the United States Supreme Court decision in Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The majority in Ingraham concluded that corporal punishment of school children is not a "punishment" within the meaning of the cruel and unusual clause of the Eighth Amendment. The majority, however, did seem to recognize that there was a distinction between the use of *919 corporal punishment on school children and on inmates of a penal institution. 430 U.S. at 668, 97 S.Ct. at 1411, 51 L.Ed.2d at 729. The majority opinion placed a great deal of emphasis on the fact that an abused school child could vindicate his rights in a tort action. 430 U.S. at 677, 97 S.Ct. at 1415,[5] 51 L.Ed.2d at 733-734.
The four dissenting Justices did not urge that corporal punishment was per se unconstitutional, but recognized that it was a "punishment" covered by the Eighth Amendment and, therefore, if applied immoderately, could constitute cruel and unusual punishment. The dissent also recognized that where physical punishment is inflicted, a "liberty" interest is at stake and due process requires at least notice of the charge and a hearing before the punishment can be inflicted. 430 U.S. 689, 691, 97 S.Ct. at 1422, 1423, 51 L.Ed.2d at 748, 749.
While I do not view Ingraham as entirely controlling on the question of whether corporal punishment of juvenile inmates violates the cruel and unusual punishment prohibition, I do not see how it can be completely ignored.
Even the dissent in Ingraham accepted as a societal norm the spanking of a juvenile for disciplinary purposes: "... it can hardly be said that the use of moderate paddling in the discipline of children is inconsistent with the country's evolving standards of decency." 430 U.S. 685, n. 1, 51 L.Ed.2d at 739, 97 S.Ct. at 1419. It is the concept of evolving standards of decency and morality of a maturing society that has become the test for cruel and unusual punishment. Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958). Certainly we must also acknowledge that confinement and disciplinary practices that may be acceptable for adult prisoners would be unacceptable for juvenile inmates.
The majority appears to condemn any physical punishment of juveniles as violative of the cruel and unusual punishment prohibition.[6] I do agree that "bench" and "floor" time, as well as "macing", as practiced at Pruntytown violate our cruel and unusual constitutional standard. West Virginia Constitution, Article III, Section 5.[7]
The reason the standard is violated by these practices is that the physical punishment was excessive. No juvenile should be required to maintain rigid poses, either standing or sitting, for prolonged periods of time. On the other hand, the concept of "quiet time" noted by the majority on page 5, which involves a form of physical restraint, does not impinge on the cruel and unusual standard, since there is a minimal level of physical discomfort involved.
As I have noted earlier, Ingraham cannot be ignored as viable authority which would sanction the practice of moderate spanking *920 for juvenile disciplinary purposes. Indeed, it would be anomalous to allow corporal punishment in public schools but to deny its use at Pruntytown, or, to make the matter even more paradoxical, to permit corporal punishment within the school setting at Pruntytown but nowhere else.
I would adopt the approach taken by the minority in Ingraham, and hold that before physical punishment can be administered certain due process procedural safeguards must be followed. I would expand the procedural safeguards since Pruntytown is, unlike our public schools, a closed institution and is not exposed to public scrutiny.[8]
This approach is consistent with those cases that hold the Due Process Clause does apply to prison disciplinary procedures. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). We have adopted this position in Tasker v. Griffith, W.Va., 238 S.E.2d 229 (1977), under our Due Process Clause. West Virginia Constitution, Article III, Section 10.
Implicit in any system of discipline is the fact that there are rules or regulations which govern the conduct of juvenile inmates so that it is known in advance what breach of conduct may result in disciplinary action. Both Wolff and Tasker required advanced written notice of the claimed violation and a brief period of time to prepare to answer it. The right to call witnesses and to present evidence in defense of the charge was recognized. Finally, some lay assistance should be made available if the charge is complex or the juvenile is not able to comprehend the matter.
In regard to the administration of corporal punishment, I would hold that this could only be administered by supervisory personnel and must not be administered so as to inflict injury. Moreover, there must be at least one witness present.[9] Certainly, corporal punishment which is disproportionate to the disciplinary infraction or which inflicts injury is not acceptable. Nelson v. Heyne, supra.
Solitary confinement of juveniles under degrading circumstances constitutes cruel and unusual punishment. Morgan v. Sproat, supra; Pena v. New York State Division for Youth, 419 F.Supp. 203 (S.D.N. Y.1976). On the other hand, courts recognize that the cruel and unusual punishment standard does not preclude the physical isolation of a juvenile who poses either a danger to himself or to others, to property, or to the orderly administration of the institution.
Such confinement should be in a habitable setting where the juvenile is provided an adequate diet, recreation, and physical exercise. Moreover, such confinement should be monitored and extend only long enough to allow the inmate to regain control of himself. Morgan v. Sproat, 432 F.Supp. at 1140; Pena v. New York State Division for Youth, 419 F.Supp. at 210; Morales v. Turman, 383 F.Supp. at 83-84.
Our statute gives implicit recognition to this rule when it provides: "Except for sleeping hours a child in a state facility shall not be locked alone in a room unless such child is out of control." W.Va.Code, 49-5-16(b)(3). In my view, solitary confinement of a juvenile is not per se prohibited. It is only when the confinement serves *921 no rational purpose and occurs under conditions which are abusive and excessive that it becomes impermissible.
There are other modes of disciplining a juvenile offender. For example, a system within which privileges can be earned by good behavior and forfeited by misconduct would be acceptable. I am not aware of any court which has condemned such a system.
Another statutory standard allows the juvenile immediate access to medical care as needed.[10] The United States Supreme Court has indicated in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), that in certain circumstances the denial of medical care can amount to cruel and unusual punishment. The statute sets a broader right to medical care than is mandated under the constitutional standard.[11] Upon the record in this case, there is not sufficient evidence to find that the quality of the medical care was such that the constitutional standard was violated.
Several of the statutory standards such as access to writing materials, mail and limitation on censorship,[12] and the reasonable access to an attorney[13] are rights that arise out of other constitutional guarantees. In Procunier v. Martinez, 416 U.S. 296, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the United States Supreme Court recognized that the right of a prisoner to use the mails and to receive mail without undue censorship is protected under the First Amendment to the United States Constitution. Procunier also recognized that accessibility to legal assistance is a due process right. See also Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Relators seemed to concede at the final argument that their rights in these respects have not been violated.
The right to access to education, including instruction, educational materials and books,[14] is a part of the right to rehabilitative programs which the courts have found to be constitutionally required. Nelson v. Heyne, supra; Morgan v. Sproat, supra; Harris v. Bell, supra; Morales v. Turman, supra; Martarella v. Kelley, supra; Inmates of the Boys' Training School v. Affleck, supra. As noted in the earlier portion of this opinion, I do not find from the record that the right to rehabilitative programs has been violated.
The remaining statutory standards of the right to daily physical exercise,[15] clothing and daily access to showers,[16] and the right to make phone calls and visitations[17] would not constitute cruel and unusual punishment if denied. A systematic denial of all these rights might reach the constitutional level, particularly where accompanied with other abuses.[18]
Another right not protected by the statute, but which is fundamental, is access to religious worship. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). No claim is made that this right is violated.
It appears, then, that the statutory standards are to a substantial degree grounded on constitutional rights, but may, in several instances, be broader than those rights currently constitutionally mandated.

III
My final comments are addressed to note 7 of the Court's opinion. Two members of the Court would require the immediate release of the relators.
*922 There is little question that courts are now more inclined to consider the rights of prisoners and the conditions under which they are incarcerated.[19] Despite this trend, however, courts have been reluctant, after finding prison conditions and practices repugnant to the Eighth Amendment, to order release as a remedy. Wiltsie v. California Dept. of Corrections, 407 F.2d 515 (9th Cir. 1968) (Release not available under Civil Rights Act § 1983); Darsey v. United States, 318 F.Supp. 1346 (D.C.Mo.1970) (practices prohibited but no release); Konigsberg v. Ciccone, 285 F.Supp. 585 (W.D. Mo.1968), aff'd, 417 F.2d 161 (8th Cir. 1969), cert. denied, 397 U.S. 963, 90 S.Ct. 996, 25 L.Ed.2d 255 (1970) (equitable restraint to preclude continuation or resumption of illegal acts accorded, petitioner not released); Commonwealth ex rel. Bryant v. Hendrick, 280 A.2d 110 (Pa.1971) (Transfer to another prison but no release).
Moreover, most commentators summarily reject or deprecate release as a remedy. See Note, Penal Institutions and the Eighth Amendment A Broadened Conception of Cruel and Unusual Punishment, 31 La.L. Rev. 395, 403 (1971); Comment, Cumulative Impact of Deplorable Conditions of Confinement in State Prisons Constitute Cruel and Unusual Punishment, Even Though Inmates Were Subjected Incidentally Rather than in Deliberate Retribution for Criminal Conduct, 23 Ala.L.Rev. 143, 155 n. 62 (1970); Note, Arkansas State Penitentiary System Violates The Eighth Amendment, 84 Harv. L.Rev. 456, 459 n. 20 (1970); Note, Cruel and Unusual Punishment, 48 Texas L.Rev. 1198, 1203 n. 35 (1970). At least one court, however, has used the threat of release as a means of controlling prison abuses. Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd. 442 F.2d 304 (8th Cir. 1971); Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969).
The question of whether and under what circumstances the actual release of a petitioner in habeas corpus is appropriate has not been ignored by this Court. See Rhodes v. Leverette, W.Va., 239 S.E.2d 136 (1977), and cases cited therein. In Rhodes, we stated: "[R]elief will be given so as to cure the underlying constitutional error." W.Va., 239 S.E.2d at 142.
Rhodes dealt with the concept of extraordinary dereliction on the part of the State in denying a clear constitutional right, which in that instance was the right to have counsel appointed to prosecute a criminal appeal. It made the distinction between those constitutional violations which affect the integrity of the trial itself, and which will normally warrant unconditional release,[20] and those constitutional violations that arise after the trial, such as the denial of a transcript or appointment of counsel for appeal. 239 S.E.2d at 142.
Prison conditions which violate the cruel and unusual standard concern matters which do not affect the integrity of the trial, and therefore do not fall into that class of habeas corpus cases in which the relief is normally unconditional release. The rule of extraordinary dereliction would therefore be applicable.
There was no attempt in Rhodes to define a rule of extraordinary dereliction which would be applicable to all possible constitutional violations. The standards set in Rhodes were specifically directed to violations of the right of an indigent criminal defendant to a trial transcript and the appointment of counsel.
*923 Here the question is: What standard of extraordinary dereliction must be shown in order to entitle juvenile offenders to unconditional release from confinement where it has been found that they have been subject to cruel and unusual punishment?
It is my view that the State cannot ordinarily be charged with extraordinary dereliction in this area until the practices have been judicially condemned as cruel and unusual. Additionally, it must be established that the State, after being given a reasonable time to correct the practices, has utterly failed to do so.[21] Finally, the State should have the right to develop fully all ameliorating circumstances surrounding its conduct and to present viable alternatives to unconditional release. I would also recognize, as we did in Rhodes, that there may be individual cases where the abuses are so shocking and extreme and without justification on the part of the State, that an immediate discharge would be warranted. 239 S.E.2d at 144.
Application of the foregoing principles to the facts of this case does not warrant the immediate release of relators. This Court moved promptly to release K. W. from his initial confinement in the "hole" and the condemned practices have been identified and prohibited such that the State proceeds at its peril by continuing the practices. Finally, the abuses were not so extreme or shocking to come within the exception that requires immediate release.
I am authorized to state that Justice CAPLAN joins with me in this concurring opinion.
NOTES
[1] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S.Const. amend. VIII.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
U.S.Const. amend. XIV, § 1.
"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. Penalties shall be proportioned to the character and degree of the offence. No person shall be transported out of, or forced to leave the State for any offence committed within the same; nor shall any person, in any criminal case, be compelled to be a witness against himself, or be twice put in jeopardy of life or liberty for the same offence." W.Va.Const. art. 3, § 5.
"No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." W.Va.Const. art. 3, § 10.
[2] No judicial officer presided at any of the deposition proceedings and the qualifications of witnesses to give opinions were not questioned then, nor in the pleadings or argument by either of the parties. We accept the opinions as being given by qualified persons.
[3] W.Va.Code, 49-5-16, adopted by the 1977 Legislature and effective January 1, 1979, establishes standards for dealing with delinquent juveniles in detention and sets excellent minimum treatment regulations which we find to be entirely consistent with our conceptions of constitutionally mandated care of incarcerated young people:

1) A child shall not be punished by physical force, deprivation of family visits or solitary confinement;
2) A child shall have the opportunity to participate in physical exercise each day;
3) Except for sleeping hours a child in a state facility shall not be locked alone in a room unless such child is out of control;
4) A child shall be provided his own clothing or individualized clothing which is clean, supplied by the facility, and daily access to showers;
5) A child shall have constant access to writing materials and may send mail without limitation, censorship or prior reading, except that mail may be opened in the child's presence, without being read, to inspect for contraband;
6) A child may make and receive regular local phone calls without charge and long distance calls to his family without charge at least once a week, and receive visitors daily and on a regular basis;
7) A child shall have immediate access to medical care as needed;
8) A child in a juvenile detention facility or state institution shall be provided access to education including teaching, educational materials and books;
9) A child shall have reasonable access to an attorney upon request; and
10) A child shall be afforded a grievance procedure, including an appeal mechanism.
[4] Dr. Jerome Miller provided an interesting insight about the effect upon a child of physical assault in institutions compared with corporal punishment by parents:

"The heart of the matter here is there is a great difference between a family disciplining a youngster and an institution disciplining a youngster. A family can even from time to time strike a youngster or slap an adolescent, and hopefully it is done out of some concern and some love. An institution cannot do that without it being received as an impersonal hatred. Institutions and bureaucracies don't love people."
[5] In our case, Dr. Miller expanded upon the institutional affect upon the child:

"Q In your experience in the area of juvenile administration and treatment, what affect does this type of living condition, in an involuntary setting that you've mentioned have on a young boy?
A Well, the research in the area of younger adolescents or children who have been institutionalized over a long period of time would indicate that they become apathetic, bored, flat, and at times appear near retarded if they have been subjected to this for a long time.
There is a great lack of personal sorts of stimulation. There is a great routinization of daily life in terms of the institution's needs.
For older adolescents there generally is a backlog of hostility built up over the period of time in this, with characteristically breaking loose when one leaves.
So generally there is an underlying violence in such a facility. Even though on the surface they may feel rather calm or look rather calm, there is a great deal of hostility and violence. It's not necessarily in terms of violent youngsters who have committed violent acts, but in terms of what the institution fosters, anger and hostility.
You get problems therefore within the institution that are not related to particularly violent history on the part of an individual youngster, but are related to perhaps a normal youngster's response to the institutional demands.
.....
Q Are you saying, Dr. Miller, that instead of being a treatment method it is anti-rehabilitative?
A It can be and I guess I'm saying to make an institution therapeutic is a very, very difficult task. It is a very long-term task and most of the histories of institutions are that it is impossible to sustain therapeutic programs in them. You can get them going for a while, but the needs of the institutions are that it is impossible to sustain therapeutic programs in them. You can get them going for a while, but the needs of the institution, the needs of the bureaucracy, the needs of handling congregate populations in certain ways are such that the minute you let up for a moment, the institution retreats to depressive and violent techniques."
[6] Other sensible alternatives to incarceration were outlined by Dr. Miller:

"For instance, one option for say a single or twice-time property offender would be a variation on what is called the Community Advancement Program. We have over five thousand in Massachusetts; whereby someone generally of college age is paid the minimum wage to spend anywhere from twenty, to forty, to fifty hours a week with an individual juvenile. The juvenile will live in his own home but the advocate will virtually surround that juvenile's leisure time from after school through the evening and all of the weekend.
"A more supervisory variation on the advocacy program is what is called the Tracking Program, where the advocate has to account for his juvenile, you might say a more repetitive offender. He has to account for his juvenile in a face-to-face interview five times every twenty-four hours and account to his supervisor. That is more often than the average parent sees their teenagers very often. That has been a very good and successful program as measured by the Harvard research.
"The very most successful program that we found in our community-based was a variation on what could be called specialized foster care. I hate to use the term "foster care" because it conjures up the very traditional foster parent image and this is not that sort of system.
"This is a system in which you pay a person or a couple, very often a single person, a younger single person, virtually a full salary in the range of Six to Ten Thousand Dollars to watch after and care for one youngster and that is their job.
"You also place with that salary extra money that the foster parent, the specialized caring person can use to buy other services, so that that person can buy psychiatric help, vocational training, alternative schooling, whatever is felt is needed, specific kinds of training and specific kind of tasks supportive work, for instance, where an employer wouldn't have the money to hire an older adolescent full time at a minimum wage, if we could pick up half the minimum wage he could pay a dollar and a quarter, for instance, and we could pay a dollar and a quarter.
"There are all sorts of variations on this, all of which would be considerably less than Fifteen Thousand Dollars per juvenile.
"Another program is the group home, where there are a wide variety of group homes; some of which the juveniles live almost full time and get all the programming within the group home. They have tutors and all that. There are others in which it is the home from which they go to work or go to school and they maybe have a therapy session once a week, and have to be in by certain hours and that sort of thing.
"The Harvard Research is showing that we depended far too much on group homes alone and that the specialized foster care and the community advocacy programs are probably a bit better.
"For the dangerous juvenile, who is demonstrated through behavior and has been convicted of such behavior that he is dangerous and violent, I think one needs to talk about a locked setting, but again small and very heavily staffed and probably quite expensive probably considerably more than Fifteen Thousand, certainly in the Twenty to Twenty-five Thousand range; but you're only talking at Pruntytown probably of only fifteen such kids a dozen to fifteen.
"Some of the others that were in on crimes against persons of the twenty or so crimes against persons could certainly be in tracking programs or other kinds of more supervisory group home settings.
"So that within budget one could develop a wide array of options and probably have something left over.
"The experience in Massachusetts is that the per capita cost per juvenile went down somewhat; but because we were fairly effective we got a few more juveniles from the court and that took up the slack in the budget. Now that has since quieted down and there are less juveniles in the system than there was before.
"I would like to add that despite a lot of rumors and all to the contrary with reference to that major deinstitutionalization in Massachusetts that, in fact, there has been no burgeoning crime rate as a result, violent crime rate in Massachusetts. In the last couple of years it has diminished, much as it has in many eastern states in terms of arrests and conviction statistics."
[7] The writer of this opinion and Justice McGraw would release petitioners from further incarceration because of the cruelties inflicted upon them. However, the majority of the Court does not concur that in this case this relief is warranted.
[1] Both K. W. and C. W. filed substantially identical petitions for habeas corpus and mandamus, although C. W.'s petition was not filed until approximately one month after that of K. W. The Court considered habeas corpus the appropriate remedy. Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).
[2] At the time C. W.'s petition was filed no claim was made that he was in solitary confinement. K. W. so asserted in his petition, and our Order, dated September 14, 1977, granting his writ, stated: "It is further ordered that the relator, K. W. be released from confinement in the `hole' as described in III(a) of the petition, pending final disposition of this proceeding."
[3] Most of the cases in this field were civil actions for declaratory judgment and injunctive relief, which enabled the parties and the court to operate under a panoply of discovery rules. These rules are not available in a habeas corpus proceeding.
[4] This is not intended as a criticism of the experts, as it is clear that they had only a limited amount of time in which to study the facility. The time spent by any expert who visited the facility did not exceed two days.
[5] A note on this subject predating Ingraham entitled Schools Corporal Punishment Without Civil or Criminal Liability is found in 72 W.Va.L.Rev. 399 (1970). There are no West Virginia cases in this field.
[6] One of the problems I have with the majority opinion is that it does not clearly state or analyze the concept of physical punishment. Physical punishment can take a variety of forms, from obvious beatings and "macings", to more subtle forms such as "bench" and "floor" time. The record does not disclose that juveniles were beaten by employees at Pruntytown, although the majority would so suggest by its quotation from Morales (ante, at 910). Moreover, the language used in Syllabus Point 3 ["beatings, slapping, kicking, or otherwise physically abusing"] is not derived from facts contained in the record. It does appear that some of the inmates had been struck by staff members, but this action was not pursuant to any policy sanctioned by the institution. I do not believe that isolated acts of physical abuse by members of the staff of a penal institution constitute cruel and unusual punishment, absent a showing that they are officially condoned, are widespread, or are so repetitious that official acquiescence can be presumed. Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971); Jackson v. Bishop, supra. This does not mean that the guilty party cannot be held civilly liable in damages. Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971).
[7] My preference would have been to rest the point solely on the cruel and unusual punishment clause of our Constitution for reasons more fully stated in my concurring opinion in Gooden v. Board of Appeals of West Virginia Department of Public Safety, W.Va., 234 S.E.2d 893 (1977).
[8] This was one of the factors that led the Court in Ingraham to conclude that Eighth Amendment protection was not needed for school children. 430 U.S. at 670, 97 S.Ct. at 1412, 51 L.Ed.2d at 730.
[9] The West Virginia Board of Education has approved, on July 11, 1975, a handbook for students in the public schools entitled Rights and Responsibilities of Public School Students in West Virginia, which contains in Section X the following provision in regard to corporal punishment:

"The use of excessive physical force by school officials on students is illegal. Moderate, corporal punishment used to enforce discipline is permitted by law. However, such punishment must not be wanton or malicious and must not be in excess of the offense.
"Corporal punishment must be administered by the principal or assistant principal, or by a teacher with the permission of the principal. In all cases, corporal punishment must be administered in the presence of a witness."
[10] W.Va.Code, 49-5-16(b)(7).
[11] The statutory standards do not become effective until January 1, 1979, and I have purposely refrained from commenting on their scope except as they relate to constitutionally mandated standards.
[12] W.Va.Code, 49-5-16(b)(5).
[13] W.Va.Code, 49-5-16(b)(9).
[14] W.Va.Code, 49-5-16(b)(8).
[15] W.Va.Code, 49-5-16(b)(2).
[16] W.Va.Code, 49-5-16(b)(4).
[17] W.Va.Code, 49-5-16(b)(6).
[18] It appears that after these suits were instituted the respondent began implementation of these standards as well as some of the other standards. As a result, relators did not contend at final argument that they are now denied these items.
[19] For various commentaries on this subject, see the following:

See, e. g., Turner, Establishing the Rule of Law in Prisons: A Manual for Prisoners' Rights Litigation, 23 Stan.L.Rev. 473 (1971); Note, Equitable Remedies Available to a Federal Court After Declaring an Entire Prison System Violates the Eighth Amendment, 1 Cap.L.Rev. 101 (1972); Note, Decency and Fairness: An Emerging Judicial Role in Prison Reform, 57 Va.L.Rev. 841 (1971); Comment, Confronting the Conditions of Confinement: An Expanded Role for Courts in Prison Reform, 12 Harv. Civil Rights-Civil Liberties L.Rev. 367 (1977); Comment, Cruel But Not So Unusual Punishment: The Role of the Federal Judiciary in State Prison Reform, 7 Cumb.L.Rev. 31 (1976).
[20] As Rhodes emphasized, while release in these instances is unconditional, the double jeopardy clause would not prohibit a retrial of the defendant. 239 S.E.2d at 141, 142.
[21] What constitutes a reasonable time to correct the practices depends on the nature of the condemned practices. Certainly practices which directly involve cruel and unusual physical abuse of prisoners can be cured immediately and the State's persistence in such practices for any appreciable time would constitute extraordinary dereliction. Those practices which relate to the living conditions of confinement which require the physical renovation of facilities would, of necessity, require more time to effect improvement. See Detainees of the Brooklyn House of Detention for Men v. Malcolm, 520 F.2d 392 (2nd Cir. 1975); Nelson v. Heyne, supra.