CHARLES HARRAH, LESTER HENDERSON,
GORDON DEAN HALL, THOMAS MEREDITH,
LARRY J. GANOE, NATHAN JACKSON TOLER,
ROBIN ELLIOTTE WORKMAN, GORDON MICHAEL BAKER,
DARRELL CRUM, CHARLES CROWDER,
STATE *ex rel.* TERRY ALLEN AKERS,
STATE *ex rel.* GARY W. GUILER.

*v.*

BOBBY J. LEVERETTE, *Superintendent,*
WEST VIRGINIA PENITENTIARY, *et al.*
(NOS. 14321, 14322, 14338, 14339,
14346, 14341, 14347, 14361,
14354, 14342, 14416, 14431,

DAVID E. TAWNEY AND DANNY BARKER

*v.*

RICHARD MOHN, *Superintendent,*
WEST VIRGINIA PENITENTIARY, *et al.,*
(NOS. 14368, 14428)

ROY LEE HARLESS, JACKIE LEE MULLINS
AND DONALD E. PENNINGTON

*v.*

WILLIAM R. WHYTE, *Superintendent,*
HUTTONSVILLE CORRECTIONAL CENTER, *et al.*
(NOS. 14369, 14370, 14405)

Decided October 7, 1980.

666

*E. Joseph Buffa* for Harrah and Henderson.

*G. Charles Hughes* for Hall, Meredith, Ganoe, Tawney and Barker.

*Hugh Rogers* for Toler, Workman, Baker, Harless, Mullins and Pennington.

*David Grabill* for Crum and Crowder.

HARSHBARGER, JUSTICE:

Relators, inmates at Huttonsville Correctional Center, seek unconditional release from confinement because they were deprived of their federal and state constitutional rights to due process of law and freedom from cruel and unusual punishment following a riot at the prison on Labor Day weekend, 1978. This Court ordered that a writ of habeas corpus *ad subjiciendum* issue, and appointed James C. West, Jr., as Commissioner to prepare written findings and recommendations. Counsel was appointed for a majority of the relators.[1]

---

[1] We acknowledge the excellent work they did preparing this matter. The record includes forty-seven depositions of relators, nonrelator inmates, and Department of Corrections employees; medical records of thirty inmates; statements taken from thirteen correctional officers as a part of the investigation conducted by the Department of Corrections following the September, 1978 disturbances; statements of eighteen inmates taken during the investigation; a Manual of Standards for Adult Correctional Institutions, published by the Commission on Accreditation for Corrections, Rockville, Maryland, in August, 1977, and other publications by the American Correctional Association; a chart prepared by relators' attorney about the conduct of the Disciplinary Committee hearings; a stipulated doctor's report; the report by the Special

At 10:30 P.M. on Sunday, September 3, 1978, a riot erupted among the four hundred forty-eight inmates at Huttonsville, a medium security prison.[2] The initial misbehavior was brought under control and the dormitories were secured by 6:00 A.M. on Monday, September 4; but another outbreak occurred in Dormitory 11 that afternoon at about 2:00. Correctional officers used a pepperfogger, a machine for dispensing tear gas, and riot sticks to quell the violence. Damage to state property was estimated at $200,000 by Commissioner West, and inmates' property of unknown value was destroyed.

Later Monday afternoon a "riot squad", composed of correctional officers and other employees, increased disciplinary activities. Guards were dressed in full riot gear with helmets, shields, gas masks, riot batons, and tear gas. An attack dog named Gus was employed to frighten inmates and tear gas was used. Several injured prisoners were treated at the infirmary for tear gas irritation, nerves, kidney problems, and cuts and bruises. Evidence about staff harassment and abuse of inmates by gouging, beating, shoving, and verbal harassment; and by forcing them to run over broken glass through gauntlets of guards armed with riot sticks, was confirmed by several (former) correctional officers. Inmates saw guards destroy their personal property and state property. In addition to night-time harassment by turning on lights, shouting, abusing and waking prisoners, guards entered dorms to "rough-up" inmates. For the next few weeks,

Commissioner; objections and exceptions to the Commissioner's report; findings with respect to the objections and exceptions to the Commissioner's report; and an extensive brief by relators. The government did not brief nor appear to argue the case.

[2] Inmates testified that the disturbance was attributable to the failure of officials to keep a promise to hold an open-house at the institution during the Labor Day weekend, the poor quality of food, and unsanitary conditions in the kitchen and dining room that led to the kitchen receiving nearly one hundred demerits by the Department of Health. The kitchen was closed for two weeks following the disturbance for extensive clean-up efforts. Unsanitary conditions that existed in the kitchen prior to the disturbance defy comprehension. It is our understanding that the kitchen now has been improved and meets Department of Health standards.

the entire inmate population was confined behind security doors in their dorms, except inmates who were temporarily transferred to our maximum security prison, the state penitentiary at Moundsville.

It appears that the most extensive abuse occurred in the crossover area where investigations into the uprising commenced on Tuesday, the 5th. Dorms of inmates (one dorm at a time) were made to run to the crossover two abreast, at a double-time pace. They ran through a gauntlet of guards and were pushed, shoved, and gouged by riot sticks as they were moving. They were forced to stand spread-eagle against a wall while waiting to be interrogated. The guards subjected them to physical and verbal abuse and hit them on the legs and back with four to five-foot long riot sticks. Many groups of inmates were forced to crawl like pigs or dogs, grunting or barking, to amuse guards; do calisthenics; or stand or sit without moving against a wall for hours. Inmates were dragged by the hair and spat upon. Threats and coercion were used to force them to confess about their own and other inmates' involvement in the disturbance. Several inmates testified that they saw guards hit other inmates between the legs with riot sticks.

Between September 4 and 8, inmates at Huttonsville were fed only bologna and/or cheese sandwiches and water. Those on medication did not receive their medicine. There was no mail call and all normal privileges were denied.

On September 8, some inmates were taken to the Moundsville penitentiary and put in North Hall segregation, where they were kept until the 12th, and then returned to Huttonsville. While at Moundsville, they were often double-celled in 5' x 7' rooms. There were no charges handed to or read to these inmates before they were transferred.

After the transferees were returned from Moundsville, write-ups of charges were distributed on September 13th and 14th. Disciplinary hearings that followed were con-

ducted by Associate Superintendent Richards, Supervisor Silvester, and Lieutenant White of the Huttonsville staff. Each hearing lasted at most ten minutes, and generally consisted of correctional officers Duncil, Willis, and Tipi reading data from yellow legal pads. Inmates were told that the data was statements by inmates, but according to all their testimony the statements were never read—only summarized—and were not shown to the accused. Prisoners were permitted to use an inmate representative, but not to have an attorney present. They could bring two witnesses to testify in their behalf,[3] but cross-examination and confrontation were not allowed. An Assistant Attorney General was present at some hearings.

After the hearings, each of the forty-five inmates charged with riot participation received a written finding of fact and notification of decision. Sentences were usually loss of good time and segregation in North Hall at Moundsville for a year.

In response to the upheaval, prison administrators ordered *all* inmates locked behind the slam doors in their respective dorms. They were deprived of normal privileges—access to the dayroom, recreation facilities, the kitchen, mess hall, general inmate population, library, and church facilities. This withdrawal of privileges continued until September 19, 1978, according to the Commissioner's findings, and twenty hours a day until February, 1979, according to the testimony of inmates and Corrections Department Commissioner McCoy. He acknowledged that the procedures violated the three-day rule of the institution,[4] but justified the extension of time by the unusual circumstances. The lockup was labeled "close confinement".

---

[3] Because inmates were locked in their dormitories, they did not have access to witnesses who resided in other dormitories.

[4] See Appendix A. Administrators must follow their own regulations to comply with due process. *Tasker v. Mohn,* ___ W.Va. ___, 267 S.E.2d 183 (1980), Syllabus Point 2; *Trimboli v. Board of Education of Wayne County,* 163 W.Va. 1, 254 S.E.2d 561 (1979), Syllabus Point 1.

All inmates, not just those suspected of misconduct, were confined behind slam doors with attendant withdrawal of privileges. They were not notified of charges against them; nor that they were being investigated. They were not apprised of results of the investigation; they were given no specific reasons for isolation having to do with the nature of the investigation. They were given no justification for extension of the segregation. In addition, several inmates (Harrah, Tawney, Akers, Baker, Barker, Ganoe, Guiler, Hall, Henderson, Meredith, Toler, Workman, and Crum) were transferred to North Hall during the investigation.

I.

This Court established minimum due process standards for placing prisoners in administrative segregation in *Tasker v. Griffith*, 160 W.Va. 739, 238 S.E.2d 229 (1977), and for transfers within the penal system, *Watson v. Whyte*, 162 W.Va. 26, 245 S.E.2d 916 (1978). *Tasker*, *supra*, held in Syllabus Point 2:

> Administrative segregation for the purpose of investigating a prisoner's misconduct may involve the placement of the prisoner in solitary or close confinement in an isolated cellblock, but it may not involve any punitive withdrawal of privileges accorded to the general inmate population, such as, by way of example and not limitation, access to legal and other reading materials, customary diet, mail privileges, and opportunities for exercise and personal hygiene.

Our Commissioner found that administrative segregation in North Hall at Moundsville involved punitive withdrawal of privileges, and those inmates subjected to that administrative segregation were justifiably aggrieved. Huttonsville inmates suffered an identical punitive withdrawal of privileges. In addition, transfer to the maximum security facility violated *Watson v. Whyte* standards.

When charges were finally made against some of the inmates, written notices delivered to them mentioned

the Huttonsville rule violated by the prisoner's conduct, but did not refer to any specific act with which the prisoner was charged. Times of the violations did not correspond to the times of the disturbances. These notices were not adequate to allow defendants to prepare their cases. *See, Tasker v. Mohn, supra; State v. Jones,* 161 W.Va. 55, 239 S.E.2d 763 (1977).

We have never specified the due process requirements for disciplinary hearings in a prison setting, but our former opinions make it clear that, at a minimum, we support the Supreme Court's position in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The requirements of *Tasker* and *Watson* are applicable to prison disciplinary proceedings:

> (a) written notice of the claimed violations ... ; (b) disclosure ... of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body ... ; and (f) a written statement by the fact-finders as to the evidence called on and reasons for [discipline].... *Watson v. Whyte, supra,* 245 S.E.2d at 920.

These requirements were ignored by prison administrators who conducted disciplinary hearings. In addition to the inadequacy of the notice, the right to confront and cross-examine adverse witnesses was completely denied, and no good cause was shown for such denial. And inmate representatives advised defendants not to call witnesses after it became clear that those who testified were being harassed by guards.

One of the most blatant violations of the *Watson v. Whyte* standards was the lack of a "neutral and detached" hearing body. The members of the Disciplinary Committee were Associate Superintendent Richards, Su-

perintendent Whyte's "right-hand-man"; Lieutenant White, a shift commander and direct superior of the riot squad personnel; and Mr. Silvester, a supervisor. A disciplinary committee, to be "neutral and detached", should not have any member with personal knowledge of the incidents charged.

The evidence also revealed that an Assistant Attorney General was present at several of the committee hearings. The presence of a government prosecutor entitles a "defendant" to counsel. *Watson v. Whyte, supra.*

Those forty-five inmates charged and brought before the Disciplinary committee were subjected to violations of their constitutional right to due process. Those locked behind slam doors for more than two weeks after the disturbance were also denied their constitutional rights. *Contra, Hoitt v. Vitek*, 361 F. Supp. 1238 (D.N.H. 1973), *affirmed*, 497 F.2d 598; *La Batt v. Twomey*, 513 F.2d 641 (7th Cir.1975).

Any penalties to which inmates were subjected by virtue of these disciplinary hearings are void.

## II

The heart of relators' claims is that they were subjected to cruel and unusual punishment by our state.[5] Conditions of prison confinement can be tested by the Eighth Amendment ban on cruel and unusual punishment.[6] Two of our cases are on point: *State ex rel. Ping-*

---

[5] U. S. Const. amend. VIII made applicable to the states by the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L. Ed. 2d 758 (1962), and W. Va. Const. art. 3, §5.

[6] Note, *Bolding v. Holshauser*: What Remedy for Violation of Prisoner's Eighth Amendment Rights?, 10 N.C. Cent.L.J. 261 (1979); Note, Applying the Eighth Amendment to the Use of Force Against Prison Inmates, 60 Boston U. L. R. 332 (1980); Note, Eighth Amendment Challenges to Conditions of Confinement: State Prison Reform by Federal Judicial Decree, 18 Washburn L.J. 288 (1979); Note, State Prisoners' Suits Brought on Issues Dispositive of Confinement: The Aftermath of *Preiser v. Rodriguez* and *Wolff v. McDonnell*, 77 Colum. L.R. 742 (1977); Robbins and Buser, Punitive Conditions of Prison Confinement: An Analysis of *Pugh v. Locke* and Federal Court Supervision of State Penal Administration Un-

*ley v. Coiner,* 155 W.Va. 591, 186 S.E.2d 220 (1972); *State ex rel. K.W. v. Werner,* 161 W.Va. 192, 242 S.E.2d 907 (1978). If the state was extraordinarily derelict, the relators are entitled to redress. *Rhodes v. Leverette,* 160 W.Va. 781, 239 S.E.2d 136 (1977).

The United States Fourth Circuit Court of Appeals has decided that inmates have an actionable right against prison officials for "confinement in a prison where violence and terror reign." *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir. 1973); *Hite v. Leeke,* 564 F.2d 670, 672-73 (4th Cir. 1977). *Woodhous*

---

der the Eighth Amendment, 29 Stanford L.R. 893 (1977); Comment, Cruel But Not So Unusual Punishment: The Role of the Federal Judiciary in State Prison Reform, 7 Cumb. L.R. 31 (1976); Note, Criminal Law——Procedural Due Process in Peno-Correctional Law, 46 St. Johns L.R. 474 (1972); Annotation, Comment Note —— Prison Conditions as Amounting to Cruel and Unusual Punishment, 51 A.L.R.3d 111 (1973 and supp.); Annotation, Relief, Under Federal Civil Rights Acts, to State Prisoners Complaining of Conditions Relating to Corporal Punishment, Punitive Segregation, or Other Similar Physical Disciplinary Measures, 18 A.L.R. Fed 7 (1974 and supp.); Comment, Habeas Corpus Challenges to Prison Discipline, 43 Fordham L.R. 963 (1975); Note, Revival of the Eighth Amendment: Development of Cruel-Punishment Doctrine by the Supreme Court, 16 Stanford L.R. 996 (1964); Wheeler, Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment, 24 Stanford L.R. 838 (1972); Note, Recent Applications of the Ban on Cruel and Unusual Punishments: Judicially Enforced Reform of Nonfederal Penal Institutions, 23 Hastings L.J. 1111 (1972); Singer, Bringing the Constitution to Prison: Substantive Due Process and the Eighth Amendment, 39 Cincinnati L.R. 650 (1970); Comment, The Role of the Eighth Amendment in Prison Reform, 38 University of Chicago L.R. 647 (1971); Note, Constitutional Law——Conditions of Confinement for Administratively Segregated Prisoners, 55 N.C.L.R. 473 (1977); Note, Constitutional Law—The Eighth Amendment and Prison Reform, 51 N.C.L.R. 1539 (1973); Plotkin, Surviving Justice: Prisoners' Rights to be Free From Physical Assault, 23 Cleve. St. L. Rev. 387 (1974); Comment, Equitable Remedies Available to a Federal Court After Declaring An Entire Prison System Violates the Eighth Amendment, 1 Cap. U.L.R.101(1972); Note, Courts, Corrections, and the Eighth Amendment: Encouraging Prison Reform by Releasing Inmates, 44 S. Cal. L. Rev. 1060 (1971); Hoffman, Prisoners' Rights: Treatment of Prisoners and Post-Conviction Remedies, §2-1 et seq. (1976 and updates).

held that prison officials can violate prisoners' Eighth and Fourteenth Amendment rights by not providing adequate protection against inmate assault or violence. Certainly, if a state must take responsibility for inmate violence toward their fellow prisoners, it must be responsible for its own violence visited upon inmates by its employees.

> In determining whether to grant relief, the court should ascertain: (1) whether there is a pervasive risk of harm to inmates . . ., and, if so, (2) whether the officials are exercising reasonable care to prevent prisoners [or guards] from intentionally harming others or from creating an unreasonable risk of harm. *See* Restatement (Second) of Torts §320 (1965). *Woodhous, supra* at 890.

The Second Circuit, describing abuses that were cruel and unusual punishment after the riots at Attica Prison in New York, stated:

> [P]risoners, some on stretchers were struck, prodded or beaten with sticks, belts, bats or other weapons. Others were forced to strip and run naked through gauntlets of guards armed with clubs which they used to strike the bodies of the inmates as they passed. Some were dragged on the ground, some marked with an "X" on their backs, some spat upon or burned with matches, and others poked in the genitals or arms with sticks. According to the testimony of the inmates, bloody or wounded inmates were apparently not spared in this orgy of brutality. *Inmates of Attica v. Rockefeller*, 453 F.2d 12, 18-19 (2d Cir. 1971).

The similarity between the Attica and Huttonsville abuses does not even require comment. This is also true of the conditions at Holmesburg Prison that the Pennsylvania Supreme Court declared unconstitutional:

> After the riot of July 4, 1970, a reign of cruel repression ensued. Prisoners were randomly se-

lected for beatings by the guards. These beatings were administered with make-shift clubs [table legs, metal mop wringers] and continued until blood was flowing from the victim. Guards set up a gauntlet through which various prisoners had to run or crawl while being clubbed from all sides. Such beatings continued night and day for two weeks after the riot. *Commonwealth ex rel. Bryant v. Hendrick*, 444 Pa. 83, 280 A.2d 110, 116 (1971).

In *United States v. Georvassillis*, 498 F.2d 883, 885 (6th Cir. 1974), a criminal action per 18 U.S.C. § 242, the court recognized: "[The] eighth amendment right to be free from cruel and unusual punishment prohibits state officers at detention facilities from subjecting prisoners to assaults and beatings." Absent self-defense or riot conditions, use of corporal punishment was banned in *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968).

The Court in *Attica* wrote:

If the abusive conduct of the prison guards had represented a single or short-lived incident, unlikely to recur, or if other corrective measures had been taken to guarantee against repetition, injunctive relief might be denied, despite the heinous character of the conduct. *See Belknap v. Leary*, 427 F.2d 496 (2d Cir. 1970). Here, however, the conduct of some of the prison guards, state police and correctional personnel, *as* testified to, was not only brutal but it extended over a period of at least several days, with one serious incident occurring much later, i.e., the surreptitious lining up and striking of inmates by prison guards in A Block .... In addition there was extensive testimony regarding night-time harassment, threats, racial slurs and similar misconduct by prison personnel .... *Inmates of Attica Correctional Facility v. Rockefeller*, 453 F.2d 12, 23 (2d Cir. 1971).

An Illinois district court decided:

> The criteria used in determining which assaults reach the magnitude of a constitutional deprivation is whether the complaint indicates that the prisoner has been administered physical and mental abuse or corporal punishment of such base, inhumane, and barbaric proportions that it shocks and offends the court's sensibilities and offends the Eighth Amendment as well. *Burns v. Swenson*, 430 F.2d 771 (8th Cir. 1970); *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968); *Wright v. McMann*, 387 F.2d 519 (2d Cir. 1967). . . .
>
> . . . .
>
> [T]he general corporal punishment grievance states that plaintiff was ... beaten, kicked, and sprayed wth mace; beaten until unconscious; handcuffed and beaten; or beaten on the head with blackjacks and kicked. ... Assuming the facts in the pleadings are true, an unjustified brutal beating by prison guards is sufficient to state a claim under 42 U.S.C., §§1981, 1983. *Aulds v. Foster*, 484 F.2d 945 (5th Cir. 1973); *Haines v. Kerner*, 404 U.S. 519, 92 S. Ct. 594, 30 L.Ed.2d 652 (1972). *Butler v. Bensinger*, 377 F. Supp. 870, 877-878 (N.D. Ill. 1974).

*See also, Martinez v. Rosado*, 474 F. Supp. 758 (S.D.N.Y. 1979), *reversed*, 614 F.2d 829 (2d Cir. 1980). This criteria for a §1983 cause of action for violation of the constitutional right to be free from cruel and unusual punishment is logically compelling and supports redress by habeas corpus.

A single spontaneous attack by a guard may simply be a common law tort, but continuing conduct subjecting prisoners to physical abuse which is unreasonable and excessive can violate the Eighth Amendment. *See Sheffey v. Greer*, 391 F. Supp. 1044, 1046 (E.D. Ill. 1975); *Donahue v. Maynard*, 437 F. Supp. 47 (D.Kan. 1977); *Fisher v. Turner*, 335 F. Supp. 577 (D. Utah 1972); *Foster*

*v. Jacob,* 297 F.Supp. 299 (C.D. Cal. 1969); *Cullum v. California Department of Corrections,* 267 F. Supp. 524 (N.D. Cal. 1967); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.) *cert. denied,* 414 U.S. 1033, 94 S. Ct. 462, 38 L.Ed.2d 324 (1973); *Landman v. Royster,* 333 F. Supp. 621, 646-47 (E.D. Va. 1971); *Suits v. Lynch,* 437 F. Supp. 38 (D.Kan. 1977); *McCargo v. Mister,* 462 F. Supp. 813 (D. Md. 1978).

We have recognized that the use of physical force to quell a riot may be necessary. *State ex rel. K. W. v. Werner, supra; see also, Beishir v. Swenson,* 313 F. Supp. 1227 (W.D. Mo. 1971). But inflicting physical force absent an existing riot, is cruel and unusual punishment, prohibited in *State ex rel. K. W. v. Werner, supra* at Syllabus Point 3:

> Punitive practices such as "bench time," "floor time," solitary confinement, *beating, slapping, kicking* or *otherwise physically abusing* juveniles ... is cruel and unusual punishment forbidden by the state constitution, and every person subjected to any of them absent exigent circumstances, shall be entitled to redress. W. Va. Const. art. 3, § 5. (Emphasis added.)

Justice Miller wrote in concurring in *K.W., supra* 242 S.E.2d, at 923:

> It is my view that the State cannot ordinarily be charged with extraordinary dereliction in this area *until the practices have been judicially condemned as cruel and unusual.* * * * I would also recognize, as we did in *Rhodes,* that there may be individual cases where the abuses are so shocking and extreme and without justification on the part of the State, that an immediate discharge would be warranted. 239 S.E.2d at 144. (Emphasis added.)

He elaborated at Footnote 21: "Certainly practices which directly involve cruel and unusual physical abuse of prisoners can be cured immediately and the State's persistence in such practices for any appreciable time would constitute extraordinary dereliction."

The continuous abuse after the Labor Day riot was cruel and unusual punishment. It shocks our consciences and offends our sensibilities. There is testimony by relators, inmate non-relators, and non-inmates that the supervisory personnel at the prison were aware of the beatings. In addition, prison personnel should have known that we previously ruled that such behavior is cruel and unusual punishment. It is extraordinary dereliction on the part of the prison administration to either allow such a continuous course of brutality or to be ignorant that it was happening. This extraordinary dereliction fits within the *Rhodes—K.W.* model. *Accord, Johnson v. McKenzie*, 160 W.Va. 385, 235 S.E.2d 138 (1977).

We hold that Article III, §5 of the West Virginia Constitution, prohibits state prison administrators and correctional officers from using physical force on inmates, absent imminent and present danger of harm to others, themselves or state property.

### III.

Having established that respondent violated relators' constitutional rights to due process and freedom from cruel and unusual punishment, there remains the remedy problem. Habeas corpus is one means for challenging abuses within the prison system,[7] and equitable principles are applicable. *Rhodes v. Leverette, supra* 239 S.E.2d, at 144, Footnote 12; *Tasker v. Griffith, supra; Armstrong v. Cardwell*, 457 F.2d 34 (6th Cir. 1972); *Mason v. Ciccone*, 517 F.2d 73 (8th Cir. 1975); *In re Crow*, 94 Cal.

---

[7] *State ex rel. Pingley v. Coiner, supra; Penrod v. Cupp*, 283 Or. 21, 581 P.2d 934 (1978) (In Banc); *State ex rel. Crosby v. Wood*, 265 N.W.2d 638 (Minn. 1978); *McIntosh v. Haynes*, 545 S.W.2d 647 (Mo. 1977) (en banc); *Commonwealth ex rel. Bryant v. Hendrick*, 444 Pa. 83, 280 A.2d 110, 51 A.L.R. 3d 98 (1971); *Levier v. State*, 209 Kan. 442, 497 P.2d 265 (1972); *Mahaffey v. State*, 87 Idaho 228, 392 P.2d 279 (1964); *In re Riddle*, 57 Cal.2d 848, 22 Cal. Rptr. 472, 372 P.2d 304, *cert. denied*, 371 U.S. 914, 83 S.Ct. 261, 9 L.Ed.2d 173 (1962); *People ex rel. Brown v. Johnston*, 9 N.Y.2d 482, 215 N.Y.S.2d 44, 174 N.E.2d 725 (1961). *Contra, Crawford v. Bell*, 599 F.2d 890 (9th Cir. 1979).

Rptr. 254, 4 Cal. 3d 613, 483 P.2d 1206 (1971) (In Bank); *People ex rel. Berry v. McGrath*, 61 Misc. 2d 113, 305 N.Y.S.2d 305 (1969); *State ex rel. Memmel v. Mundy*, 75 Wis. 2d 276, 249 N.W.2d 573 (1977); *Coffin v. Reichard*, 143 F.2d 443 (6th Cir. 1944); *Konigsberg v. Ciccone*, 285 F. Supp. 585 (W.D. Mo. 1968).

An exhaustive search of habeas corpus cases involving cruel and unusual punishment of prisoners failed to discover any case wherein an abused prisoner was unconditionally released.[8] Courts have affirmatively remedied petitioners' complaints by ordering substantial changes in prison conditions and prospectively enjoining use of unconstitutional facilities or means of discipline. *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); Jones v. Wittenburg, 330 F. Supp. 707 (N.D. Ohio 1971), *affirmed*, 6 Cir. 456 F.2d 854. *See*, reviews of judicial intervention in articles cited in Footnote 4, *supra*, including 7 Cumb. L. Rev. 31; 1 Capital U.L.Rev. 101; 18 Washburn L.J. 288; 29 Stanford L. R. 893; 23 Hastings L. J. 1111; 10 N. C. Cent. L. J. 261; 18 A.L.R. Fed. 7.

Management of a prison system is an executive, not a judicial, function. We recognize that it is a difficult and

---

[8] We found mention of one case in a law review article, Comment, Equitable Remedies Available To A Federal Court After Declaring An Entire Prison System Violates the Eighth Amendment, 1 Capital U. L. Rev. 101, 107 (1972). In a preliminary injunction order, a district court in New Mexico limited a jail population to sixty by releasing inmates having the shortest remaining sentences. *Curley v. Gonzales*, Civil No. 8872 (D.N.M., July 29, 1970). All inmates had been convicted of misdemeanors relating to intoxication. The case was later dismissed when the court adopted a list of improvements agreed to by the jail keepers.

In *Johnson v. Dye*, 175 F.2d 250 (1949), the Third Circuit released a fugitive from a Georgia chain gang from extradition because of the cruel and unusual treatment he suffered at the hands of Georgia jailers. The decision was reversed by the United States Supreme Court because state remedies in Georgia were not exhausted. *Dye v. Johnson*, 338 U.S. 864, 70 S.Ct. 146, 94 L.Ed. 530 (1949), *reh. denied*, 338 U.S. 896, 70 S.Ct. 238, 94 L.Ed. 551.

It has been recommended by one commentator that release of nonviolent inmates may encourage prison reform. Note, Courts, Corrections, and the Eighth Amendment: Encouraging Prison Reform By Releasing Inmates, 44 S. Cal. L. Rev. 1060 (1971).

important task. Maintaining security among persons who have previously indicated a reticence to abide by the law takes great skill and competence. We do not claim expertise in this area and prefer not to interfere with prison management, but we cannot allow the warders' difficulty to outweigh inmates' constitutional rights.

Prison does not strip an individual of all human dignity. This Court is dedicated to the preservation of the rights vested in every person by our constitution and the federal constitution. Any attempt by the government to abridge those rights is anathema to us; repeated infractions, despite clear proscriptions by this Court and federal courts, are unforgivable.

We mentioned in *K. W. v. Werner, supra,* the need for psychological testing of correctional officers. Our admonition has not helped, if it has been heeded. We now order psychological testing of all correctional officers before they are employed, and at least annually throughout their employment. *See, Morales v. Turman,* 364 F. Supp. 166 (E.D. Tex. 1973). Those found psychologically unsuited for employment as guards shall not be or continue to be employed.

Also, any officer who practices brutality must be discharged from his employment, provided that the charges against him are proved in keeping with civil service regulations.

Due process deprivations which the inmates suffered because of the failure of the administration to follow *Tasker v. Griffith, supra, Watson v. Whyte, supra,* and *Wolff v. McDonnell, supra* will be remedied by expunging from inmate records all reference to any alleged involvement or charges stemming from the disturbances at Huttonsville on September 3 and 4, 1978, and all good time lost by reason of findings of the discliplinary committee shall be restored.

In addition to these equitable remedies we can and do afford, relators have rights set out in 42 U.S.C. §1983, in

federal court. *See, Shields v. Hopper*, 519 F.2d 1131 (5th Cir. 1975); 18 A.L.R. Fed. 7 (1974 and supp.). It is also clear that 42 U.S.C. §1983 actions may be pursued in our state courts. *See, Terry v. Kolski*, 78 Wis.2d 475, 254 N.W.2d 704 (1977); *Kish v. Wright*, 562 P.2d 625 (Utah 1977); *Colvin v. Bowen*, 399 N.E.2d 835 (Ind. 1980); *Rzeznik v. Chief of Police of Southampton*, ____ Mass. ____, 373 N.E.2d 1128 (1978); *Rosacker v. Multnomah County*, 43 Or. App. 583, 603 P.2d 1216 (1979); *Ingram v. Moody*, 382 So.2d 522 (Ala. 1980); *Adler v. Los Angeles Unified School Dist.*, 98 Cal. App. 3d 280, 159 Cal. Rptr. 528 (1979); *Tyler v. Whitehead*, 583 S.W.2d 240 (Mo. 1979).

When the state is guilty of extraordinary dereliction, discharge is a remedy. We warned prison officials about its possible use in previous opinions, especially *K. W. v. Werner, supra*. We will not continue to witness cruel and unusual punishment and blatant due process violations by prison officials, and respond with injunctions and admonitions.

Our Commissioner recommended in his report, "that this Court by appropriate Order notify the West Virginia Department of Corrections that inmate abuse and harassment will not be tolerated and that future proven instances of inmate abuse and harassment may result in a finding of extraordinary dereliction sufficient to warrant unconditional release from confinement of inmates subjected to such abuse and harassment." If this were the first instance of systematic guard brutality in the West Virginia prison system, we might agree with the recommendations of Commissioner West. But it is not. We have already exhibited as much tolerance of official abuse of prisoners as we are capable of. The course of cruelties to which these people were subjected, although apparently ended, makes reduction in the degree of restriction of the liberties of the brutalized prisoners, necessary. Our prison administrators must understand that abuse of the constitutional rights of prisoners may result in release of the victims.

The Department of Corrections knows the abuses its employees committed; it presented little defense or even contradiction to the evidence thereof. We now afford it an opportunity to amend for the constitutional deprivations suffered by those inmates who were subject to violent retribution: Within thirty (30) days from receipt of the order that will be activated by this opinion, we direct that the Department provide us a plan, tailored to each aggrieved individual's present status[9] and the effronteries which he suffered as testified to in his deposition or proved by other evidence, which reduces the degree of restraint to which each such individual is presently subject. Such reductions in length and conditions of confinement might include, in appropriate cases, release from parole restrictions for persons already paroled; release on parole or on conditions comparable to parole for persons still incarcerated; reduction in length of sentences and transfer to less restrictive facilities or programs.

We also order the Department of Corrections, within the same thirty-day period, to provide us with a timetable and plan for the implementation of psychological testing of correctional officers.

We will examine the plans and if they are acceptable make such further orders as may be appropriate to effectuate them.

We realize that this appears to be a compromise remedy between unconditional release and continuation of present status. However, we are extending moderation in the remedy simply because we really do understand that in the management of prisons, the state must rely upon agents who are afflicted with the human fallibilities borne by all of us and that tempering these infirmities is not a short term, simple chore. We may demand, pronounce, mandate, and enjoin by putting pen to paper; administrators must mold human beings.

---

[9] We have included in Appendix B a list of the affected relators and their current status.

We do not, except with great reluctance, discharge prisoners whose constitutional right deprivations do not go to their guilt or innocence of the underlying charges for which they were incarcerated. But we will not subject persons to cruel and unusual punishment. Those activities must be permanently corrected or else the government may be enjoined from putting any convicted criminals in jail or prison.

We agree with the summation in *Holt v. Sarver*, 309 F. Supp. 362 (E.D. Ark. 1970), at 385, *affirmed*, 442 F.2d 304 (8th Cir. 1971):

> Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas [or West Virginia] is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution. . . .

*Writs granted as molded.*

### Appendix A
### Rules And Regulations
### Governing Inmates Of The
### Huttonsville Correctional Center

## IX. Discipline

### F. *Segregation*

It may be necessary to segregate some inmates from the general population and provide close confinement for varied periods of time and for the purposes of investigation, of punishment, for the protection of themselves, or others, or because of their inability to get along in the general population.

1. Administrative Segregation—An inmate may be held for a maximum of three (3) days without a charge, pending investigation. An inmate may be placed in administrative segregation for any of the following reasons:

   a. Awaiting Disciplinary Committee action

   b. For investigation

   c. For protection

   d. At the inmate's own request when approved by the Shift Commander on duty.

   e. Pending trial for a crime committed in the institution.

   f. Custody risk who cannot be held in the general inmate population

   g. Inmates who, after punitive treatment, still cannot reasonably and safely be returned to the regular inmate population.

2. Administrative Segregation Conditions—While in Administrative Segregation the inmate will have access to and use of items necessary for personal hygiene.

   a. Bathing—The inmate shall be bathed while in segregation daily when possible.

   b. Mail and Visiting—There shall be no restrictions on mail. However, visits from individuals even though on the inmate's approved visiting and correspondence list will be restricted to meet existing security conditions.

   c. Food—Regular meals shall be fed.

   d. Legal Materials—Access to legal materials as noted elsewhere in these rules shall be provided.

   e. Cell—Insofar as possible, inmates will be placed in single cells.

3. Disciplinary Segregation—Segregation is ordinarily used as punishment when reprimands, loss of privileges, suspended sentences, and similar measures have been tried without satisfactory results. Segregation is a major disciplinary measure and should be used judiciously when all other forms of action prove inadequate, where the safety of others is concerned, or when the serious nature of the offense makes it necessary.

   a. Medical Care and Procedure—Insofar as possible, inmates who are to be placed in segregation shall be checked by a physician or medical officer prior to confinement. In the event neither is available, the medical classification should be carefully checked. If medical classification is such that life will not be jeopardized, the inmate may be placed in segregation and checked by medical personnel at the first available period. When there is doubt regarding health, the inmate should be placed in hospital segregation until evaluated by medical personnel.

   b. Personal hygiene should be encouraged. Inmates should be given a bath at least three (3) times a week. Inmates should be urged to brush their teeth daily. Inmates should be shaved a minimum of twice a week.

   c. Clothing—Inmates in segregation confinement should be given coveralls. Changes in clothing should be effected at least two (2) times per week.

   d. Bedding—Inmates in administrative segregation should be furnished with a mattress and the number of blankets necessary to keep them warm.

   e. Visits to Segregation—Prisoners in segregation shall be visited, observed or evaluated a minimum of:

       (1) Two times each shift by a correctional officer.

       (2) At least once by the officer in charge of each shift.

       (3) Weekly by the Warden or Deputy Warden or Associate Warden.

  f. Release from Punitive Segregation—The Disciplinary Committee will review the case of each inmate in punitive segregation, determine the inmate's attitude, and at the completion of his punishment, return him to the regular inmate population if he may reasonably be expected to adequately adjust and conform to the rules and regulations. Additional charges and hearing will be made if release at conclusion of punishment is not possible. Segregation for punishment should always be for the shortest period of time that will accomplish the desired results of favorable adjustment.

  g. Return to Work—After a man has been in solitary over an extended period, he should be given a light but productive work assignment.

4. Restriction to Quarters—Restriction to disciplinary quarters is to be used for short periods for infractions that call for loss of privileges but do not require transfer to special facilities and may be with full furnishings and diet, or restricted furnishings and diet.

(Appendix B on Next Page)

APPENDIX B
(As of September 25, 1980)

| RELATOR | CONVICTION | SENTENCE | STATUS | MINIMUM DISCHARGE DATE | MAXIMUM DISCHARGE DATE |
|---|---|---|---|---|---|
| 1. Harrah | Delivery of Controlled Substance | 1-5 | Discharged 11/28/79 | | |
| 2. Henderson | Breaking & Entering | 1-10 | Paroled 8/28/79 | | 2/7/84 |
| 3. Hall | Accessory Before the Fact | 1-4 | Paroled 11/21/79 | | 10/8/81 |
| 4. Meredith | Grand Larceny | 1-10 | Penitentiary | 4/25/83 | |
| 5. Ganoe | Breaking & Entering | 1-10 | Paroled 8/22/79 | 3/9/83 | 2/25/85 |
| 6. Tawney | Daytime Burglary | 1-10 | Paroled 10/17/79 | | 11/1/82 |
| 7. Workman | Attempt to Commit Armed Robbery | 10 | Paroled 10/24/79 | | |
| 8. Mullins | Grand Larceny | 1-10 | Penitentiary | 10/2/82 | |
| 9. Crum | Perjury | 1-10 | Retried—Probation | | 6/81 |
| 10. Akers | (A) Attempted Armed Robbery | 5-18 | Penitentiary | 2/15/85 | |
| | (B) Breaking & Entering | 1-10 | | 3/19/81 | |
| 11. Pennington | Breaking & Entering | 1-10 | Work Release | 10/3/80 | 9/30/84 |
| 12. Barker | Breaking & Entering | 1-10 | Paroled 5/7/80 | | 11/19/86 |
| 13. Baker | Breaking & Entering | 1-10 | Paroled 10/24/79 | | 4/20/83 |
| 14. Toler | Grand Larceny | 1-10 | Paroled 9/12/79 | | 2/10/85 |
| 15. Guiler | Grand Larceny | 1-10 | Paroled 4/2/80 | | |
| 16. Harless | Grand Larceny | 1-10 | Kanawha County Jail | 4/21/83 | |
| 17. Crowder | Second-Degree Murder | 5-18 | Huttonsville | 11/8/85 | 12/16/86 |